# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CHOLYONDA BROWN as Personal Representative, of the Estate of ODIE BROWN,

    Plaintiff,

v.

GOVERNOR RICK SNYDER, in his individual capacity only, CITY OF FLINT; DANIEL WYANT, NICK LYON, EDEN WELLS, ANDY DILLON, LIANE SHEKTER-SMITH, ADAM ROSENTHAL, STEPHEN BUSCH, PATRICK COOK, MICHAEL PRYSBY, and BRADLEY WURFEL, in their individual capacities; JEFF WRIGHT, EDWARD KURTZ, DARNELL EARLEY, GERALD AMBROSE, DAYNE WALLING, HOWARD CROFT, MICHAEL GLASGOW, and DAUGHERTY JOHNSON, in their individual capacities, McLAREN REGIONAL MEDICAL CENTER, CITY OF FLINT BOARD OF HOSPITAL MANAGERS, d/b/a HURLEY MEDICAL CENTER, NORB BIRCHMEIER, ANN NEWELL, MD, LOCKWOOD, ANDREWS & NEWNAM, P.C., LOCKWOOD, ANDREWS & NEWNAM, INC., LEO A. DALY COMPANY, VEOLIA NORTH AMERICA, LLC, VEOLIA NORTH AMERICA, INC., and VEOLIA WATER NORTH AMERICA OPERATING SERVICES, LLC, Jointly and Severally,

    Defendants.

Case No. 18-
Hon.

COMPLAINT FOR DECLARATORY RELIEF, MONEY DAMAGES, AND JURY DEMAND

_____ /

GEOFFREY N. FIEGER (P30441)
TODD J. WEGLARZ (P48035)
Attorneys for Plaintiff
19390 W. 10 Mile Road
Southfield, MI  48075
(248) 355-5555
(248) 355-5148 (fax)
tweglarz@fiegerlaw.com

_____ /

## COMPLAINT FOR DECLARATORY RELIEF, MONEY DAMAGES, <u>AND JURY DEMAND</u>

**Introductory Statement**

1.      Defendant public officials and private engineering corporations, caused a catastrophic public health crisis beginning in April 2014 by exposing the population of the City Flint and those who used the water of the City of Flint, to contaminated Flint River water as a source of usable water. The contaminated drinking water exposed Odie Brown to the deadly *legionella* bacteria which caused her death on January 9, 2015 while she was a patient at McLaren Regional Medical Center located in Flint.

2.      The Government Defendants, as well as Defendant McLaren Regional Hospital ("McLaren") and the Hurley Defendants, knew as early as the summer and fall of 2014 that there was a significant increase in reported cases in Genesee County of fatal and life threatening non-fatal illnesses caused by the exposure to *legionella* bacteria beginning in May 2014 and that the likely source of the increase in illness was the introduction of Flint River water as a drinking water source. These government officials, acting in concert with Defendant McLaren and Defendant Hurley, exacerbated the crisis by concealing the increased risk of exposure to the deadly *legionella* bacteria, failing to take effective remedial action to eliminate it, failing to advise and warn, and then lying about it to cover up their misconduct.

3.     Four sets of Defendants are responsible for the severe harm suffered by the Plaintiffs.

a.     The first set of Defendants are government officials, including Governor Rick Snyder, Daniel Wyant, Nick Lyon, Eden Wells, Andy Dillon, Liane Sheckter-Smith, Adam Rosenthal, Stephen Busch, Patrick Cook, Michael Prysby, Bradley Wurfel, Jeff Wright, Edward Kurtz, Darnell Earley, Gerald Ambrose, Dayne Walling, Howard Croft, Michael Glasgow, Daugherty Johnson, and the City of Flint are collectively herein referred to as the "Government Defendants."

b.     The second set of Defendants – with only one member - is McLaren. McLaren is a major hospital in Genesee County and the location of Brown's exposure to the legionella bacteria when Brown was admitted therein in September 2014.

c.     The third set of Defendants are the Hurley Defendants which include the Hurley Medical Center (owned and operated by the City of Flint through its Board of Hospital Managers), and Norb Birchmeir, and Ann Newell, the Hurley employees / agents responsible for ensuring Hurley's hospital water supply was safe.  If Decedent was not exposed to legionella at McLaren, Plaintiff alternatively asserts that Decedent was exposed to Legionella at Hurley during her hospitalizations therein in September, October, November and December of 2014.

d.     The fourth set of Defendants consists of engineering companies, including Lockwood, Andrews & Newnam, P.C. ("LAN PC"), Lockwood, Andrews & Newnam, Inc. ("LAN Inc."),  Leo A. Daly Company ("LAD"), Veolia North America, LLC ("Veolia LLC"), Veolia North America, Inc. ("Veolia Inc."), and Veolia Water North America Operating Services, LLC ("Veolia Water") are referred to collectively herein as the "Engineering Defendants."

## SUMMARY OF THE CONSTITUTIONAL AND CIVIL RIGHTS
## VIOLATIONS BY THE GOVERNMENTAL DEFENDANTS

4.      *Due process based on state created danger doctrine*: Plaintiff, Cholyonda Brown, as the Personal Representative of the Estate of Odie Brown, states that Odie Brown was a member of a discreet group of individuals – those who, in April 2014 and thereafter resided within the city limits or used as serviceable for drinking, washing and cleaning purposes, the public water in Flint, as distinguished from all other adjacent and nearby communities which continued to have access to clean and healthy water. The particular persons, the Plaintiff herein, sustained violations of her substantive due process rights, including her fundamental right to not have the state create, inflict and/or exacerbate dangers through the culpable actions of public officials;

5.      *Due process based on bodily integrity doctrine*: Plaintiff (Odie Brown) has sustained violations of her substantive due process rights including her fundamental right to bodily integrity, through direct and co-Defendants conspiracy to so do. Those rights violated and the means of such violations, include the following:

> a.      *42 U.S.C. § 1983, Fourteenth Amendment/Due Process, bodily integrity*: Plaintiffs have sustained serious injuries as a result of the decisions of Government Defendants and Engineering Defendants to provide Odie and others lethal water and then, in conspiracy with Defendant McLaren to conceal that lethality from the Plaintiff;
>
> b.      *42 U.S.C. § 1983, Equal protection, race*: Plaintiff has sustained serious injuries as a result of certain Government Defendants' decision to deliver a superior water product to the water users in the remainder of Genesee County

because those communities are predominately white, while at the same time delivering a grossly inferior and dangerous water product to water users in Flint due to the reality that the City of Flint community was predominately African American;

c.   *42 U.S.C. § 1985(3):* Plaintiff has sustained serious injuries as a result of the conspiracy of two or more of the Defendants to directly or indirectly conspire to violate Plaintiff's constitutional rights, said conspiracy being based on racial animus;

d.   *Elliot Larsen Civil Rights Act ("ELCRA"):* Plaintiff has sustained serious injuries as a result of their denial of the full and equal enjoyment of public services provided by the Government Defendants because they utilized public services in a predominately African American community.

## SUMMARY OF McLAREN'S MISCONDUCT

6.   *McLaren and Hurley Defendants conspired with Government Defendants*: McLaren and Hurley conspired with Government Defendants to conceal the highly increased potential for deadly *legionella* in Flint public water, after April 2014 and to violate the Plaintiffs' constitutional rights;

7.   *McLaren and Hurley failed to provide its patients with safe water:* McLaren and Hurley, like many other facilities in Flint, were available to be used by those members of the public, as its patients, where they typically would have exposure to the public water supplied by the City of Flint.  Beginning in April, 2014, McLaren's and Hurley's source of water came from the Flint Water Treatment Plant ("FWTP") which utilized water from the Flint River. By the summer and fall of

2014, McLaren and Hurley were aware that there had been a substantial increase in the number of fatal and non-fatal cases of Legionnaires' Disease and the increase coincided with the introduction of Flint River water as a source of drinking, washing, and cleaning water for the Flint population. McLaren and Hurley were aware that Legionella and other contaminating agents were in the water supply, and McLaren a n d Hurley had a duty to provide safe water to its patients. McLaren and Hurley negligently, grossly negligently and/or deliberately failed to take proper steps to provide safe water for its patients.

8.     McLaren a n d Hurley failed to inform their patients of the known risks associated with exposure to the Flint River water while they were patients at its facility: By the summer and fall of 2014, McLaren and Hurley knew of risks associated with exposure to the deadly legionella bacteria emanating from use of the Flint River water and yet failed to inform its patients, in particularly Odie Brown and her family, of those risks.

9.     *McLaren and Hurley participated in a conspiracy with Government Defendants to cover-up evidence of both its misconduct, as well as that of the Government Defendants, thus rendering Plaintiff's judicial remedies more difficult, inadequate, and/or ineffective:* McLaren and Hurley conspired with public officials, Government Defendants herein, to cover-up the fact that the source of Odie Brown's Legionella bacteria was from the hospital water supply and/or from the City of Flint water supply.

6

## SUMMARY OF THE ENGINEERING DEFENDANTS' MISCONDUCT

10.     *The Engineering Defendants conspired with Government Defendants*: to conceal the highly dangerous and potentially fatal consequences of switching from a safe water supply to the highly dangerous – including the potential *introduction* of *legionella* – water from the Flint River and to thereafter conceal this danger from the public, after April 2014;

11.     *Professional negligence in engineering services related to distribution of water from Flint River*: Plaintiff has sustained serious injuries as a result of the Engineering Defendants' professional negligence in their duties relating to the distribution of water from the Flint River using the FWTP, and in failing to report the dangers associated with not installing proper anti-corrosive treatment when using the Flint River as a primary source of water.

12.     *Professional negligence and fraud in declaring Flint water safe and potable*: Plaintiff has sustained serious injuries as a result of the Engineering Defendants' professional negligence, to wit:

a.     Failing to properly evaluate Flint's water system and in publicly declaring its water safe and potable;

b.     Failing to conduct a root cause analysis, which would have revealed that the pipes were corroding and causing lead and *legionella* to enter the residents' homes and commercial buildings;

c.     Failing to mention that the addition of a corrosion inhibitor was necessary to prevent these serious and well-known health issues;

d.    Failing to mandate the usage of highly acidic ferric chloride, rather than advising that the pH of the water should be increased.

13.    The Engineering Defendants also were professionally negligent and committed fraud in their effort to cover up their mistakes by knowingly or recklessly misinforming the public about the existence and extent of the public health crisis. This misinformation includes the concealment of the introduction of *legionella* into the public water source and into the hospital water supplies.

## JURISDICTION AND VENUE

14.    This is a civil action brought pursuant to 42 U.S.C. § 1983 seeking injunctive and declaratory relief together with monetary damages against the Government Defendants (including Hurley Defendants) for violations of the Thirteenth and Fourteenth Amendments of the United States Constitution, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d, *et seq*.

15.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331, which authorizes federal courts to decide cases concerning federal questions; 28 U.S.C. §1343(a)(3) and (4), which authorizes federal courts to hear civil rights cases; and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

16.    The Court has personal jurisdiction over Defendant McLaren, Hurley Defendants, and the Engineering Defendants because each of them are located, and/or have conducted business, in the Eastern District of the State of Michigan. There, McLaren, Hurley, and the Engineering Defendants conducted business, violated the

rights of Plaintiff's Decedent, conspired with the Government Defendants, and committed torts in Michigan, by themselves and their agents and/or alter egos, which caused Plaintiff's Decedent to suffer serious personal injuries in Michigan. The Court has personal jurisdiction over the Government Defendants named herein as public officials of the State of Michigan, including the Emergency Managers, sued in their individual capacities; and public officials and employees of the City of Flint, sued in their individual and official capacities; the Genesee County Drain Commissioner, sued in his individual and official capacity; and the City of Flint for its customs, policies or practices (including those for Hurley Hospital), which were a moving force in the violations of Plaintiff's Decedent's Constitutional rights.

17.     Similarly, this Court has personal jurisdiction over the Governor of the State of Michigan, in his individual capacity.

18.     Venue is proper in this Court because the injury, death and damage occurred in the Eastern District of Michigan, Defendants reside or conduct business in the Eastern District of Michigan, and Plaintiff resides in the Eastern District of Michigan.

## PARTIES

### A. PLAINTIFF

19.     Odie Brown was sixty-five years old when she died of Legionella Pneumonia on January 9, 2015. Ms. Brown was diagnosed with Legionella Pneumonia on December 25, 2014, and had several prior hospital contacts before then, including

9

admission to McLaren on September 10, 2014, and from September 17, 2014 through September 18, 2014.  Ms. Brown was subsequently hospitalized at Hurley Hospital from September 19, 2014 through September 29, 2014; October 2, 2014 through October 9, 2014; November 17, 2014 through December 10, 2014; and December 19, 2014 through January 5, 2015.

20.    Cholyonda Brown, Decedent's daughter, is the Personal Representative for the Estate of Odie Brown, and sues in that capacity;

21.    Decedent Odie Brown was at all times herein a resident of t h e  City of Flint,  Michigan and between April 25, 2014 and January 9, 2015, suffered personal injuries as a result of exposure to the City of Flint's water, in particular as a  result  of exposure to the *legionella* bacteria at Defendant McLaren Hospital located in Flint, Michigan.

## B. GOVERNMENT DEFENDANTS

22.    All individual Defendants are sued in their individual and/or official capacities as indicated  below.

23.    Defendant Rick Snyder is the Governor of the State of Michigan ("Governor") is sued in his individual capacity for compensation for the Plaintiffs, insofar as his deliberate conduct violated the Plaintiff's rights to due process and to equal protection of the law, as secured by the Fourteenth Amendment to the United States Constitution. Daniel Wyant ("Wyant") was Director of MDEQ and is sued in

his individual capacity, acting under color of law, because he participated in the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm.  In particular he participated in the concealment the presence of *legionella* and of its grave danger.

24.    Andy Dillon ("Dillon") was Treasurer for the State of Michigan and is sued in his individual capacity because, acting under color of law, along with the Governor, Jeff Wright, Dayne Walling and Edward Kurtz, caused harm to Bertie Marble and her loved ones when they developed an interim water delivery plan in June 2013 which favored the predominately white Genesee County water users and discriminated against the water users in Flint, a predominantly African American community.

25.    Nick Lyon ("Lyon") was Director of the Michigan Department of Health and Human Services ("MDHHS") and is sued by Plaintiff in his individual capacity because, while acting under color of law, he participated in the decisions that deliberately created, increased and prolonged the public health crisis and the exposure to *legionella* at issue in this case and participated in the concealment of the harm his department caused Plaintiff. Lyon conspired with McLaren Hospital to cover-up evidence that exposure to the Flint River water was the likely cause for the sharp increase in reported deaths and injuries stemming from exposure to the *legionella* bacteria thereby rendering Plaintiff's judicial remedies inadequate or ineffective. He did so

deliberately, knowing of the increased presence of *legionella* and of Legionnaires' Disease as early as 2014, yet concealing that information.

26.     Defendant Eden Wells ("Wells") was the Chief Medical Executive within the Population Health and Community Services Department of the MDHSS and is sued by Plaintiff in her individual capacity because she participated in the decisions that deliberately created, increased and prolonged the public health crisis and the exposure to *legionella* at issue in this case and participated in the concealment of the harm his department caused Plaintiff. Wells, while acting under color of law, conspired with McLaren Hospital agents, representatives and employees to cover-up evidence that exposure to the Flint River water was the cause for the sharp increase in reported deaths and injuries stemming from exposure to the *legionella* bacteria thereby rendering Plaintiffs' judicial remedies inadequate or ineffective. She did so deliberately, knowing of the increased presence of *legionella* and of Legionnaires Disease as early as 2014, yet concealing that information.

27.     Liane Shekter-Smith ("Smith") was Chief of the Office of Drinking Water and Municipal Assistance for MDEQ, holding that position until October 19, 2015 when she was removed from her position. Smith is sued in her individual capacity because during her term as Chief of Drinking Water for MDEQ, acting under color of law, she approved and participated in the decisions that deliberately created, increased and prolonged the public health crisis and the exposure to *legionella* at issue in this case, and participated in the concealment of the harm her department caused Plaintiff.

28.     Adam Rosenthal ("Rosenthal") was a Water Quality Analyst assigned to the Lansing District Office of the MDEQ. Rosenthal is sued in his individual capacity because, as Water Quality Analyst for MDEQ, acting under color of law, he approved and participated in, the decisions that deliberately created, increased and prolonged the public health crisis and the exposure to *legionella* at issue in this case and participated in the concealment of the harm his department caused Plaintiff.

29.     Stephen Busch ("Busch") was District Supervisor assigned to the Lansing District Office of the MDEQ. Busch is sued in his individual capacity because, as District Office Supervisor of MDEQ, acting under color of law, he deliberately created, increased and prolonged the public health crisis and the exposure to *legionella* at issue in this case and participated in the concealment of the harm his department caused Plaintiff.

30.     Patrick Cook ("Cook") was at all relevant times a Water Treatment Specialist assigned to the Lansing Community Drinking Water Unit of the MDEQ. Cook is sued in his individual capacity because, acting under color of law, as Water Treatment Specialist District of MDEQ, he approved of, and thereby participated in, the decisions that deliberately created, increased and prolonged the public health crisis and the exposure to *legionella* at issue in this case and participated in the concealment of the harm his department caused Plaintiff.

31.     Michael Prysby ("Prysby") was an Engineer assigned to District 11 (Genesee County) of the MDEQ. Prysby is sued in his individual capacity because, as

Engineer assigned to District 11, acting under color of law, he approved of, and thereby participated in the decisions that deliberately created, increased and prolonged the public health crisis and the exposure to *legionella* at issue in this case and participated in the concealment of harm his department caused Plaintiff.

32.     Bradley Wurfel ("Wurfel") was the Director of Communications for MDEQ. Wurfel is sued in his individual capacity because, as Director of Communications for MDEQ, acting under color of law, he was responsible for the deliberately misleading and inaccurate communications that increased and prolonged the public health crisis and the exposure to *legionella*, at issue in this case and for making false statements and providing false assurances which caused harm to Plaintiff.

33.     Jeff Wright ("Wright") has been the Genesee County Drain Commissioner since 2001. Wright is sued in his individual capacity because, acting under color of law, as the Genesee Country Drain Commissioner, he conspired with other Defendants to deprive Plaintiffs of their civil and constitutional rights and participated in and/or aided and abetted others to violate Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the Michigan Elliot Larsen Civil Rights Act and the Equal Protection Clause of the 14th Amendment, as well as the 13th Amendment of the United States Constitution.

34.     Edward Kurtz ("Kurtz") was the Emergency Manager of Flint appointed by the Governor in August 2012 and served in this capacity until July 2013. Kurtz is sued in his individual capacity because, acting under color of law, during his

term as Emergency Manager of Flint, he deliberately created, increased and prolonged the public health crisis and the risk exposure to *legionella* at issue in this case and participated in the concealment of the harm he caused Plaintiff. Kurtz is also sued because he conspired with other Defendants to deprive Plaintiff of her civil and constitutional rights and participated in or aided and/or abetted others to violate Plaintiff's rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the 14th Amendment, as well as the 13th Amendment of the United States Constitution.

35.     Darnell Earley ("Earley") was the Emergency Manager of the City of Flint appointed by the Governor on November 1, 2013 and served in this capacity until January 12, 2015. Earley is sued in his individual capacity because, during his term as Emergency Manager of Flint, acting under color of law, he deliberately created, increased and prolonged the public health crisis and the exposure to *legionella* at issue in this case and participated in the concealment of the harm he caused Plaintiff. Earley is also sued because he conspired with other Defendants to deprive Plaintiff of her civil and constitutional rights and participated in and/or aided and abetted others to violate Plaintiff's rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the 14th Amendment, as well as the 13th Amendment of the United States Constitution.

36.     Gerald Ambrose ("Ambrose") was the Emergency Manager of the City of Flint appointed by the Governor on January 13, 2015 and served in this

capacity until April 28, 2015. Ambrose is sued in his individual capacity because, acting under color of law, during his term as Emergency Manager of Flint, he deliberately increased and prolonged the public health crisis and the exposure to *legionella* at issue in this case and participated in the concealment of the harm he caused Plaintiff. Ambrose is also sued because he conspired with other Defendants to deprive Plaintiff of her civil and constitutional rights and participated in and/or aided and abetted others to violate Plaintiff's rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the 14th Amendment, as well as the 13th Amendment of the United States Constitution.

37.     Dayne Walling ("Walling") was Mayor of Flint from August 4, 2009 until November 9, 2015 when he was unseated by Karen Weaver. Walling is sued in both his individual and official capacities. He is individually liable insofar as he personally approved of, and thereby participated in, the decisions that deliberately created, increased and prolonged the public health crisis and the exposure to *legionella,* acting under color of law, and participated in the concealment of the harm he caused Plaintiff. Walling is also sued because he conspired with other Defendants to deprive Plaintiff of her civil and constitutional rights and participated in and/or aided and abetted others to violate Plaintiff's rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the 14th Amendment, as well as the 13th Amendment of the United States Constitution. Additionally, as Mayor, he was a final policymaker for the Defendant City of Flint, and

as such his actions, decisions, and judgments constituted customs, policies, and/or practices of the Defendant City of Flint.

38. Howard Croft ("Croft") was Director of Public Works for the City of Flint. Croft is sued in his individual capacity because, as Director of Public Works, acting under color of law, he approved of, and thereby participated in, the decisions that deliberately created, increased and prolonged the public health crisis and the exposure to *legionella,* at issue in this case and participated in the concealment of the harm he caused Plaintiff.

39. Michael Glasgow ("Glasgow") was Utilities Administrator for the City of Flint. Glasgow is sued in his individual capacity because as Utilities Administrator, acting under color of law, he deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiff.

40. Daugherty Johnson ("Johnson") was the Utilities Administrator for the City of Flint. Johnson is sued in his individual capacity because, as Utilities Administrator, acting under color of law, he approved of, and thereby participated in the decisions that deliberately created, increased and prolonged the public health crisis and the exposure to *legionella* at issue in this case and participated in the concealment of the harm he caused Plaintiff.

41. The City of Flint ("Flint") is a municipal corporation, so authorized by the laws of the State of Michigan that operates Department of Public Works and

provides water to its residents and property owners as part of its responsibilities and services. Despite the protests of a number of elected and appointed officials within the organization, Flint, through its policies, customs and practices deliberately created, increased and prolonged the public health crisis and the exposure to *legionella*, at issue in this case and participated in the concealment of the harm it caused Plaintiff. Flint is also named as a Defendant because it deprived Plaintiff of their civil and constitutional rights by violating Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA.

42.     Defendants Kurtz, Earley and Ambrose as Emergency Managers, acted in both their individual capacities and as agents of the State of Michigan, and their official capacities as policy makers for Defendant City of Flint within the meaning of *Monell*, and as such their actions constituted customs, policies and/or practices of the Defendant City of Flint.

43.     At all relevant times hereto, the conduct of Defendants Walling, Croft, Glasgow and Johnson was pursuant to the customs, policies and/or practices of Defendant City of Flint.

### C.   McLAREN REGIONAL MEDICAL CENTER

44.     McLaren is a major hospital located in Flint, Michigan. McLaren, like many other facilities in Flint, was open to the public. Beginning in April, 2014, McLaren's source of water came from the FWTP which utilized water from the Flint

River. By the summer and fall of 2014, McLaren, through its agents and representatives, was well aware that there was a significant increase in the number of fatal and non-fatal cases of Legionnaires Disease and the increase coincided precisely with the introduction of Flint River water as a source of drinking water for the Flint population. McLaren was also aware of an increase in the number of its own patients diagnosed with Legionella in the summer and fall of 2014.  McLaren had a duty to provide safe water to its patients. McLaren negligently failed to take proper steps to provide safe water for its patients.

45.    By the summer and fall of 2014, McLaren had sufficient knowledge of the risks associated with exposure to the deadly *legionella* bacteria emanating from use of the Flint River water and the use of its own hospital water supply, and yet deliberately failed to so inform its patients of this serious risk of injury and/or death.  Further, McLaren conspired with  public  officials to  conceal from  the public, including Odie Brown's family, that she was at risk for contracting *Legionella* pneumonia while using the Flint River water and the hospital water supply.

### D. ENGINEERING DEFENDANTS

46.    Defendant  Lockwood,  Andrews  &  Newman  P.C  ("LAN  PC")  is  a Michigan professional corporation with its principal place of business located at 1311 S. Linden Road, Suite B, Flint, Genesee County, Michigan 48532. In 2008, LAN PC was incorporated by  Lockwood, Andrews, & Newman, Inc. ("LAN Inc."), after it was retained to conduct studies and reports of a new water supply that was being developed

for Flint, Genesee County. At this Flint location, LAN PC held itself out to the world as Leo A. Daly Company ("LAD Company"). Upon information and belief, substantial amount of work and services provided by LAN P.C. were conducted at LAN Inc.'s Chicago, Illinois location.

47.    Defendant LAN Inc. is a Texas corporation with its principal place of business in Houston, Texas. At all relevant times, LAN Inc. conducted business in Genesee County, Michigan through LAN PC. Per its website, LAN Inc.'s Michigan office is located at 1311 S. Linden Road, Suite B, Flint, Michigan 48532. LAN Inc. holds itself out as a full-service consulting firm offering planning, engineering and program management services, including civil infrastructure engineering and municipal water treatment and design. At all relevant times, LAN Inc. held itself out to be a LAD company.

48.    The corporate structure of LAD and LAN Inc. is such that LAD exerts nearly unfettered control over its subsidiary.

49.    Defendants LAN PC, LAN Inc. and LAD (collectively "LAN" or "LAN Defendants") deliberately placed the Flint Water Treatment Plant in operation while understanding the inherent dangers of doing so and yet, did so without installing proper anti-corrosive treatment that was required to render the water less dangerous and not life-threatening.

50.    The LAN Defendants worked in concert and conspiracy with the Government Defendants, to create, cause, prolong, and exacerbate the damage alleged

herein. In addition to the alter ego allegations above, the entities are referred to collectively because they acted in concert and their acts overlapped or were identical.

51.     Similarly, in evaluating and/or approving the safety of the Flint River and the FWTP; and, in deciding to move forward with this plan, the LAN Defendants were performing a 'public function' and therefore their actions were all taken under color of law.

52.     Defendant Veolia LLC is a Delaware Limited Liability Company with its principal place of business at 200 E. Randolph Drive, Suite 7900, Chicago, Illinois 60601.

53.     Defendant Veolia Inc. is a Delaware Limited Liability Company with its principal place of business at 200 E. Randolph Drive, Suite 7900, Chicago, Illinois 60601.

54.     Defendant Veolia Water is a Delaware Limited Liability Company with its principal place of business at 101 W. Washington Street, Suite 1400 East, Indianapolis, Indiana 46204.

55.     Veolia LLC, Veolia Inc. and Veolia Water design and provide water solutions for communities and industries across North America under the banner "Veolia North America."

56.     The Veolia Defendants are parties to this action based upon providing professionally negligent engineering services in reviewing Flint's water system and declaring the water safe to drink. The Veolia Defendants worked in concert in

negligently advising the government and thereby causing the damage alleged herein. These entities are referred to collectively because they acted in concert and their acts overlapped or were identical.

57. Additionally, the Veolia Defendants deliberately implemented and approved a plan to use Flint River water as public water, notwithstanding its known dangerous and potentially life threatening qualities. In so acting, Veolia acted in a public capacity and, therefore, under color of law. Further, the Veolia Defendants undertook these measure in conspiracy to implement these unhealthy and dangerous measures and then to fail and/or refuse to warn the public, including the Plaintiffs herein of these dire consequences, all in conspiracy with the Government Defendants herein.

## STATEMENT OF FACTS

58. This case arises from the tragic and preventable poisoning of the City of Flint. The outrageous acts and omissions of the Defendants have caused immeasurable and irreparable harm to Plaintiffs.

### A. Dangers From the Flint River Water Have Been Well- Known for Decades.

59. The FWTP was constructed in 1917 to draw water from the Flint River as the source of Flint's drinking water for nearly 50 years until 1964.

60. From 1964 to 2014, Flint water users received their water from Lake Huron via purchase from the Detroit Water and Sewerage Department ("DWSD"). This water did not require treatment through the FWTP.

63.    During this half-century, Flint water users enjoyed safe, clean, fresh water in their homes, businesses, hospitals and other places of public services.

64.    Use of the Flint River as a primary drinking source had been rejected as recently as 2011.

**B.    Despite Well-Known Dangers, Defendants Decided to Use Flint River Water as the Primary Water Source for the City of Flint.**

65.    In November of 2012, Defendant Kurtz wrote Defendant Dillon suggesting that Flint join a new pipeline from Lake Huron, the Karegnondi Water Authority ("KWA"), due to claimed projected cost savings over DWSD. This was written pursuant to political pressure from Defendant Wright, who had aggressively promoted the formation of the KWA in 2009.

66.    Throughout 2012, DWSD presented to Defendants Kurtz, Wright, Dillon, Walling and Snyder compelling arguments, based on numerous studies, demonstrating that from a cost and water reliability standpoint, Flint should reject Wright's pressure to join KWA and continue to receive water from DWSD. In late 2012, Dillon, requested the independent engineering firm of Tucker, Young, Jackson and Tull ("TYJT") to assess whether it would be cost- effective for Flint to switch from water supplied by DWSD and join the KWA water delivery system.

67.    In February 2013, TYJT concluded that it would be more cost-effective for Flint on both a short term and long term basis to continue to be supplied with water from DWSD.

68.    Yet, on April 16, 2013, Governor Snyder deliberately authorized Kurtz to enter into a contractual relationship with KWA for the purpose of supplying water to Flint beginning in mid-year 2016.

69.    In June 2013, Defendants Dillon, Kurtz, Wright, and Walling developed an interim plan ("Interim Plan") to use the Flint River water before KWA became operational. The Interim Plan would cover 2.5 years (April 25, 2014 until approximately October, 2016), despite these Defendants' knowledge that to do so was dangerous.

70.    Michael Glasgow, supervisor of the FWTP's laboratory and water quality informed the MDEQ on April 16, 2014, that the FWTP was not fit to begin safe operations and that "management" was not listening to him because "they seem to have their own agenda."

71.    Beginning in June 2013 and continuing through April 25, 2014, Snyder, Dillon, Wyant, Shekter-Smith and others created a dangerous public health crisis and vastly increased the risk of exposure to *legionella* for the users of Flint tap water when they, along with Kurtz and Earley, ordered and set in motion the use of highly corrosive and toxic Flint River water knowing that the FWTP was not ready.

72. For at least a year prior thereto, Snyder, Dillon, Wyant, Shekter- Smith, Kurtz, Early, and the City of Flint knew that using the Flint River water was dangerous and could cause serious public health issues, including the exposure to *legionella*.

### C. The LAN Defendants Failed to Meet Their Duties of Care and Competence as Design Engineers for the FWTP.

73. On June 10, 2013, the LAN Defendants submitted a proposal to Flint for upgrading the FWTP entitled "Flint Water Treatment Plant Rehabilitation – Phase II." The proposal was to make "improvements . . . intended to help the City operate[] the plant on a full time basis using the Flint River." The proposal was signed by J. Warren Green, Professional Engineer (Project Director) and Samir F. Matta, Professional Engineer (Senior Project Manager).

74. The LAN Defendants claimed in their proposal that their "staff has the knowledge, expertise and the technical professionals to handle all aspects of the projects. Our staff has firsthand knowledge of the [FWTP] . . . ."

75. The proposal included the following relevant sections:

a. A "Scope of Services" section that stated the "project involves the evaluation and upgrade of the Flint Water Plant to provide continuous water supply service to the City of Flint (Flint) and its customers." The upgrades and improvements would allow the use of the Flint River as a water supply;

b. A "Standards of Performance" section where the LAN Defendants "agree[d] to exercise independent judgment

and to perform its duties under this contract in accordance with sound professional practices." As part of the proposal, it was understood that Flint was relying upon the professional reputation, experience, certification, and ability of the LAN Defendants.

76.     In or around June 2013, Flint formally retained the LAN Defendants as the design engineer for improvements and upgrades to the FWTP for the treatment of new water sources, including both the Flint River and the KWA pipeline. In deciding to proceed with the transition to the Flint River, the City of Flint noted the LAN Defendants' "extensive experience in this field," and relied upon the LAN Defendants' identification of the "engineering, procurement, and construction needs" for the project. Although the City recognized that water from the Flint River "would be more difficult to treat," the City concluded, based on LAN's recommendations, that the Flint River was "viable as a source" of the City's water. LAN continued to advise the City with respect to its transition to the Flint River through 2015, and ultimately was paid more than $3.8 million for its engineering services.

77.     On April 9, 2014, the City received the necessary permits from MDEQ to draw Flint River water for distribution as the supply source for its water distribution system during the multi-year transition to the new KWA facility.

78.     Despite receiving these permits, the Flint water system was never prepared for the switch to Flint River water. The Flint River was contaminated with rock-salt chlorides washed into the river from road surfaces over the course of many harsh Michigan winters. The level of chlorides in the Flint River was eight times the

levels provided in DWSD water. Chlorides are highly corrosive, and must be neutralized with anticorrosive agents, such as phosphates, before entering public water systems. It was well known to these defendants that the corrosive water of the Flint River, not having been properly treated would result in the corrosion of pipes, such that dangerous bacteria, in particular *legionella*, would leach into drinking water in Flint.

79.     The LAN Defendants' actions facilitated the transfer of Flint's water source to Flint River water without proper corrosion control treatment. The LAN Defendants were well aware of the immediate need for corrosion control. Yet, incredibly, at the time of the switch to Flint River water, no phosphates were being added to the water supply. In fact, nothing whatsoever was being done to account for the corrosive nature of the Flint River water and the released of bacteria, in particular the deadly *legionella.*

### D.     Numerous Signs of the Public Health Crisis Caused By the Contaminated Water Were Evident Within Weeks of the Switch.

80.     On April 25, 2014, Flint officially began using the Flint River as its primary water source, despite the fact that the proper preparations had not been made and that Glasgow had warned that the FWTP was not ready.

81.     Within weeks of switching water sources, complaints began to pour in from residents regarding the smell, taste, and color of the drinking water.

82.     In June 2014, citizen complaints about contaminated water continued without the State doing anything to address these complaints. Many Flint water users reported that the water was making them ill.

83.     On August 14, 2014, Flint's water tested above legal limits for total coliform and E. coli bacteria, an early warning regarding the likely release of *legionella*. The City issued boil water advisories on August 16, 2014 and September 5, 2014 in response but never advised, warned, or informed as to the likelihood, let alone possibility, of a release of *legionella.*

84.     Another byproduct of the switch to Flint River water was an extremely high buildup of Trihalomethane ('TTHM"). As officials were beginning to assess the extent of Flint's TTHM problems, another problem emerged in the summer of 2014 – the Michigan Department of Health and Human Services (MDHHS) noted, but never publicly reported, an outbreak of Legionnaires Disease.

85.     Legionnaires' Disease is a severe form of pneumonia which, when treated early enough, has a mortality rate of 20%; if left untreated, the rate rises to 80%. Infection in humans occurs when water droplets contaminated with *legionella* bacteria are inhaled or when water-containing *legionella* enters the trachea. Extensive studies of *legionella* have established that the pathogen enters the water supply when the "bio-film" protecting pipes is stripped away – which is exactly what happened when the River's corrosive water entered the City's pipes.

86.     Yet all of the Government Defendants, including the McLaren and Hurley Defendants, remained silent and failed to announce, let alone warn the public, Plaintiffs in particular, so that Flint water could be avoided and, with it, *legionella.*

### E.     LAN and Veolia Defendants Were Asked to Evaluate the Problems, But Failed to Do So Properly.

87.     Prior to Plaintiff's exposure to Legionella, the LAN Defendants were on actual notice of the need to assess the factors contributing to high TTHM levels. The high TTHM levels were induced because of a failed attempt to address increased bacteria in the Flint River water by the use of chlorine.

88.     Despite its representations that it would conduct a thorough, all-encompassing review of the Flint Water system, it took Veolia only 6 days  to issue an interim report on its findings, which it presented to a committee of Flint's City Council on February 18, 2015. Per the interim report, the only issue not in the Veolia Defendants' scope of study was "why the change from Lake Huron water via the Detroit system pipeline to Flint River water] or the history of  the utility."

89.     In the interim report, the Veolia Defendants' falsely indicated that Flint's water was "in compliance with drinking water standards." It also noted that "[s]afe [equals] compliance with state and federal standards and required testing." The Veolia Defendants effectively declared publicly and falsely that Flint's water was  safe.

90.     As a result of the LAN and Veolia Defendants' actions, the residents of Flint, including Plaintiffs, were exposed to far greater amounts of poisonous and

bacterial water, and over a substantially longer period of time. At the same time all other Defendants were shielded from exposure, criticism, oversight, civil and criminal liability that would have resulted had the Defendants' actions regarding the Legionnaires outbreak not been hidden and concealed.

### F. The LAN and Veolia Defendants' Conclusions Exacerbated the Crisis.

91.     The Veolia Defendants were required by the prevailing engineering standard of care to have recommended maintaining the drinking water's neutral pH by adding phosphate, but instead, in direct contradiction of federal authorities, recommended increasing the dosage of ferric chloride – a very potent, corrosive acid, rather than advising that the pH of the water should be increased.

### G. Despite the Numerous Signs of the Growing Crisis, the Government Defendants Failed to Act, and Concealed Known Dangers from the Plaintiffs.

92.     Prior to Odie Brown's exposure to *legionella* bacteria, State officials met with McLaren representatives to discuss the ongoing threat to public health posed by the *legionella* bacteria in the Flint River water.

93.     The Governor and his staff, the Genesee County Health Department, and Defendants Lyon, Wells, and others at MDHHS had already been aware for at least three months of the ongoing public health threat to the people of Flint, including

the threat of Legionnaires Disease resulting from the use of the Flint River water; similarly, they were aware of the dire need to warn the public of these dangers, in particular the Plaintiffs herein; yet they deliberately remained silent and did nothing. The public health crisis was neither addressed nor reported in any serious and/or non-frivolous way. It was concealed.

94.     On January 13, 2015, Defendant Earley resigned his position as Emergency Manager and the Governor replaced him with Gerald Ambrose.

95.     On January 21, 2015, State officials including Defendants Snyder, Dillon, Lyon, Wells, and others ordered water coolers to be installed in State buildings operating in Flint. The Government Defendants were concerned that this action, if it became widely known by the public, would reveal their vulnerability to accusations of dishonesty because they had been advising the residents of Flint that it was safe to drink the tap water and at the same time arranging for alternative water sources for the State employees who were working in Flint.

96.     Prior to Plaintiff's Legionella exposure, the Government Defendants and McLaren suspected and knew that the Flint River water was associated with the significant increase in Legionella cases for both the county and McLaren, during the summer and fall of 2014.

97.     On January 27, 2015, the City of Flint and McLaren were placed on formal notice by the Genesee County Health Department ("GCHD") that there was an association between the outbreak of Legionnaires' Disease and the commencement of

31

the use of Flint River water. Once again, Defendants did nothing about the impending health catastrophe.

98.     By the end of January 2015, at the very latest, and almost certainly, months before, Defendant Snyder and the Governor's office were fully aware of the public health emergency caused by the rise in *legionella* bacteria found in the Flint River and launched a cover-up of this public health crisis.

99.     By February 1, 2015, the Governor was fully informed of the health crisis in Flint and knew that there was an imminent threat to the people of Flint. Yet, neither the Governor nor the other Government Defendants took any corrective or advisory action.

100.     Prior to Plaintiff's exposure to Legionella, James Henry of the GCHD was concerned that he was being stonewalled by the State and City in accessing public health information about the Legionnaires Disease outbreak in Genesee County. The concealment of the public health emergency by City and State officials – Defendants herein – was shocking and unconscionable.

101.     Prior to Plaintiff's exposure to Legionella, the Defendants knew that the extreme public health emergency involved lead poisoning, contamination of the water supply with deadly *legionella* bacteria and other metals, minerals, and microbes, and a host of other dire health problems.

102.     On March 25, 2015, Flint City Council voted to re-connect to Detroit's water system. Governor Snyder's appointed Emergency Manager, Gerald Ambrose, deliberately exacerbated the severe public health dangers and hazards by rejecting this vote of the City Council.

103.     By June, 2015, Miguel Del Toral of the EPA warned that the failure to inform Flint water users of dangers associated with Flint River water "border(ed) … on criminal neglect."

104.     By the fall of 2014 and early 2015, Defendants Lyon and Wells were aware from MDHHS data that Legionnaires Disease was on the rise during the same period of time. Lyon and Wells were aware of this dangerous condition but did nothing to report the findings to the Plaintiffs or the public.

105.     Lyon and Wells also knew that these elevated blood lead levels, and an increase of Legionnaires Disease found in its own database, correlated with the introduction of the corrosive Flint River water into the Flint water distribution system. Lyon did not order that any action be taken to warn the public.

106.     Between the death of Odie Brown and October 2015, the Government Defendants actively and deliberately continued to falsely deny and cover-up the public health crisis that they created so as to deflect blame and responsibility.

107.    On October 8, 2015, the Governor recognized that he could no longer pretend that the water from the Flint River was safe. He finally ordered Flint to re-connect with the Detroit water system which contained corrosion control chemicals.

108.    The re-connect to DWSD took place on or about October 16, 2015.

### H. Defendants' Misconduct Has Caused the Plaintiff's Decedent to Suffer Devastating Health Effects and Other Personal Injuries Including Death.

109.    As a result of the failure to properly treat water from the Flint River, corrosive water was delivered throughout the Flint Water System. The water crisis in Flint caused an outbreak of Legionnaires Disease. As explained above, the presence of *legionella* was a direct and proximate result of the switch to the Flint River as a water source and related conduct.

110.    At least 87 individuals exposed to Flint River water contracted Legionnaires Disease and at least 14 have died. At least one case of Legionnaires Disease occurred in 2016, even after the City's water supply was switched back to the DWDS, indicating that the disease still poses a risk to the community.

## COUNT I

**ALL GOVERNMENT AND ENGINEERING DEFENDANTS**
**42 U.S.C. § 1983 – 14th AMENDMENT SUBSTANTIVE DUE**
**PROCESS- STATE-CREATED DANGER**

111.    Plaintiff incorporates by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

112.    Plaintiff has a clearly established right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to be protected from risks, dangers, dangerous situations, or being made more vulnerable to increased risk of harms, affirmatively created and/or caused by persons acting under color of state law.

113.    The Government Defendants, while acting under color of state law, affirmatively created or exacerbated the dangers and dangerous situations, specifically directed at the Plaintiff and others who used the public water in Flint and excluded from those dangers, individuals who did not live in Flint nor use Flint water. Plaintiff was so exposed, making her more vulnerable to said dangers, and the Government Defendants did so with an extreme degree of culpability.

114.    The Government Defendants, while acting under color of state law, affirmatively continued, increased and perpetuated the dangers, risks of harm and dangerous situations creating the public health crisis, when they deliberately and affirmatively denied, lied about, covered up, deceived, discredited and ignored said

known dangers and risks of harm to which they exposed Plaintiff, member of a discreet group to whom these dangers were directed, making them more vulnerable to said dangers.

115.    That discreet group is those persons who live in the City of Flint or who happen to use Flint water, as distinguished from those who may live nearby, indeed adjacent to the City of Flint, but not in Flint; and, who do not use Flint Water.

116.    The Government Defendants were aware that their conduct would result in the deprivation of Plaintiffs' due process rights to be protected from the dangers, dangerous situations, or being made more vulnerable to the dangers affirmatively created and perpetuated by them.

117.    This conduct was reckless, deliberately indifferent and/or so outrageous as to shock the conscience, such that it was culpable in the extreme, insofar as the Government Defendants knew of and disregarded the substantial risk of serious harm to Plaintiffs.

118.    These actions of the Government Defendants constituted affirmative acts that caused and/or substantially increased the risks of physical, emotional and economic harm to the Plaintiffs.

119.    As a direct and proximate result of the unconstitutional acts of these Defendants as alleged in this Complaint, Plaintiff demands compensation for violations of her decedent's fundamental rights to bodily integrity, property and liberty interests, including, but not limited to:

a.    Serious life-threatening disease, culminating in death of Odie Brown;

b.    Conscious pain and suffering;

c.    The loss of the love, society, companionship, and affection of Plaintiff's Decedent, i.e. her children, siblings, grandchildren;

d.    Punitive damages;

e.    The costs of litigation and attorney fees, allowable under 42 U.S.C. §1988.

## COUNT II

### ALL GOVERNMENT AND ENGINEERING DEFENDANTS 2 U.S.C. § 1983 – 14th AMENDMENT SUBSTANTIVE DUE PROCESS – BODILY INTEGRITY

120.    Plaintiff incorporates by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

121.    The conduct of the Defendants, while acting under color of law and/or in conspiracy with those acting under color of law, did violate the bodily integrity of Odie Brown, a liberty interest secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

122.    These Defendants were aware that their conduct could result in the deprivation of Odie Brown's fundamental due process right to bodily integrity.

123.    These Defendants deliberately and knowingly breached the constitutionally protected bodily integrity of Plaintiff by creating, then concealing, and

then perpetuating the ongoing exposure to *legionella*, with deliberate indifference to the known risks of harm which said exposure would, and did, cause to Ms. Brown.

124.    These Defendants had ample opportunity to reflect and deliberate before they acted and/or failed to act.

125.    Each of the acts committed by all Defendants herein constituted aid and encouragement to all other Defendants herein in the commission of the wrongful acts described herein.

126.    These tortious and wrongful acts of Defendants, along with others, constituted a conspiracy to cause injury to Plaintiff's Decedent.

127.    The aforementioned conspiracy was committed pursuant to a common plan to commit the tortious and wrongful acts described herein.

128.    The aforementioned conspiracy was also undertaken without any fault or wrongdoing by Plaintiff or Plaintiff's Decedent herein.

129.    Plaintiff's Decedent has a clearly established fundamental right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to bodily integrity.

130.    The conduct of the Government Defendants and the Engineering Defendants, all while acting under color of law, endangered and/or threatened Plaintiff's Decedent's fundamental liberty interest to bodily integrity as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

131.     The Government Defendants were aware that their conduct could result in the deprivation of Plaintiff's Decedent's fundamental due process rights to bodily integrity.

132.     The Government Defendants deliberately and knowingly breached the constitutionally protected bodily integrity of Plaintiff's Decedent by creating and perpetuating the ongoing exposure to contaminated water, with deliberate indifference to the known risks of harm which said exposure would, and did, cause to Plaintiff's Decedent.

133.     The conduct of the Government Defendants was both reckless and outrageous, entitling Plaintiff to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

134.     As a direct and proximate result of Defendant's unconstitutional acts alleged in this Complaint, Plaintiff demands compensation for violations of Decedent's fundamental rights to bodily integrity, property and liberty interests, including, but not limited to those specifically set forth in Paragraphs 118 and 119 above.

## **COUNT III**

### **GOVERNMENT AND ENGINEERING DEFENDANTS ONLY 42 U.S.C. § 1983 –14th AMENDMENT EQUAL PROTECTION OF THE LAW**

135.     Plaintiffs incorporate by reference that allegations set forth in all foregoing paragraphs, as if fully set forth herein.

136.     Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz and Earley, acting under color of law, and in their respective individual and/or official capacities, engaged in conduct and/or adopted laws and policies that violated Plaintiffs' rights to the equal protection of the law, under the Fifth and Fourteenth Amendments to the United States Constitution.

137.     These Defendants knew that the water from the Flint River was grossly inferior to the Lake Huron water Flint and Genesee County citizens had been receiving from DWSD.

138.     These Defendants knew that the raw water from the Flint River would have to be processed at the Flint WTP which would have required millions of dollars of upgrades.

139.     These Defendants knew that using the raw water from the Flint River had been rejected as recently as 2011.

140.     Recognizing these facts, Defendants devised an Interim Plan that caused the predominately white water users of those areas of Genesee County outside of Flint to receive the safe and superior water from DWSD, whereas the water users of predominantly African American Flint received water that was known to be grossly inferior and unsafe, i.e. Flint River water.

141.     As evidence of the fact that race discrimination was the reason for treating the two groups of water users differently, the cost of continuing with the finished water product from the DWSD for all water users (both Genesee County and

Flint) would have been substantially less than the cost of upgrading the Flint WTP in order to safely process the raw Flint River water.

142.    Given the clear difference in the treatment between these two groups of similarly situated water users, the deliberate and intentional decisions and actions of these Defendants in devising the Interim Plan was the product of racial discrimination in violation of the Equal Protection Clause.

143.    Both Governor Snyder's Task Force and the State of Michigan Civil Rights Commission have acknowledged and admitted that Flint water users were denied equal protection of the laws.

144.    Governor Snyder's Task Force found that Flint residents, who are majority Black or African American and among the most impoverished of any metropolitan area in the United States, did not enjoy the same degree of protection from environmental and health hazards as that provided to other communities.

145.    The Michigan Civil Rights Commission found that the people in and around Flint did not enjoy the equal protection of environmental or public health laws.

146.    As a direct and proximate result of Defendant's unconstitutional acts alleged in this Complaint, the Estate Bertie Marble demands compensation for violations of Plaintiff's Decedent's fundamental rights to bodily integrity, property and liberty interests, including, but not limited to those specifically set forth in Paragraphs 118 and 119 above.

## COUNT IV

### GOVERNMENT DEFENDANTS AND MCLAREN
### 42 U.S.C. § 1983-DUE PROCESS DENIAL OF
### ACCESS TO JUDICIAL REMEDIES

147. Plaintiffs incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

148. The Government Defendants became aware in the summer and fall of 2014 that there was a substantial increase in the number of reported illnesses and deaths in Genesee County caused by exposure to the *legionella* bacteria beginning in May, 2014, which in turn was associated with and/or caused by the use of Flint River water as a source of public water.

149. Prior to Plaintiff's Decedent's exposure to Legionella, representatives of the Department of MDHS, the Genesee County Health Department and McLaren met to review the increase in reports of illnesses and deaths stemming from exposure to the *legionella* bacteria and whether the increase was attributable to the use of the Flint River water into the Flint and hospital water distribution system.

150. From the summer of 2014 through fall of 2015, the Government Defendants and McLaren refused to inform the public, including the Plaintiff herein, of the significant risk of serious injury or death resulting from exposure of *legionella* bacteria found in the Flint and hospital water supply.

151.   Instead of informing the public of these risks, McLaren conspired with the other Government Defendants to cover-up evidence that the Flint River water and the hospital water system was the source of the illnesses and deaths caused by exposure to the *legionella* bacteria.

152.   Plaintiff's Decedent enjoyed a 14th Amendment due process right to effective access to a judicial action which cannot be unreasonably denied by government official actions that suppress and/or conceal pertinent evidence.

153.   Plaintiff's Decedent was subjected to a conspiracy between McLaren, and the Government Defendants to cover-up evidence of exposure to and source of the deadly *legionella* bacteria that rendered Plaintiff's Decedent's judicial remedies inadequate or ineffective in violation of Plaintiff's due process right to access to judicial remedies.

154.   The cover-up rendered Plaintiff's Decedent's judicial remedies inadequate or ineffective and impaired the underlying causes of actions for Odie Brown's family because although she likely died from exposure to this deadly bacteria and, yet, because of the cover-up alleged above, they failed to take steps which should have been taken to preserve sputum, urine samples or other bodily fluids so that a definitive cause of death could have been established.

155.   Each of the acts committed by Lyon, Wells, and McLaren constituted aid and encouragement to the other co-conspirators in the commission of the wrongful acts described in this Count.

156.  These tortious and wrongful acts of McLaren and the Government Defendants constituted a conspiracy to cause injury to  the Plaintiff's Decedent.

157.  The aforementioned conspiracy was committed pursuant to a common plan to commit the tortious and wrongful acts described herein.

158.  The aforementioned conspiracy was also undertaken without any fault or wrongdoing by Plaintiff or Plaintiff's Decedent herein.

159.  As a direct and proximate result of the conspiracy and deprivation of due process as alleged above the Plaintiffs demand compensation for the following loss, injuries and damages, including, but not limited to:

    a.    Hampering Plaintiff's and Plaintiff's Decedent's ability to prove serious life threatening disease, culminating in death of Odie Brown;

    b.    Hampering Plaintiff's and Plaintiff's Decedent's ability to prove pain and suffering, including mental suffering and anguish to Odie Brown;

    c.    Mental suffering and anguish directly inflicted on the heirs-at-law to Decedent's Estate, including Plaintiff, in concealing from them the cause and source of Decedent's illness and the source thereof;

    d.    Hampering Plaintiff's ability to prove the loss of love, society, companionship and affection to the next of kin of Odie Brown;

    e.    Punitive damages;

    f.    The costs of litigation and attorney fees, allowable under 42 U.S.C. §1988.

## COUNT V

**DEFENDANTS CITY OF FLINT, KURTZ, AMBROSE, EARLEY, WRIGHT, WALLING, SNYDER, DILLON MCL 37.2302 (ELIOT LARSEN) - DENIAL OF PUBLIC SERVICES**

160.    Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

161.    Flint and Walling and Emergency Managers Kurtz, Ambrose and Earley represent a public facility, agency, board owned and operated by a political subdivision of the state established to provide public service to the public within the meaning of MCL 37.2301(b).

162.    If not "provider[s]" of a public service, Wright, Walling, Ambrose, Kurtz, and/or Earley are liable under MCL 37.2701(b) because they enabled, aided or abetted the "provider" to violate MCL 37.2302(a).

163.    Snyder, State of Michigan and Dillon are liable under MCL 37.2701(b) because they aided the "provider" of water services to Plaintiff's Decedent in the acts which denied Plaintiff's Decedent of the full and equal enjoyment of water services because of race.

164.    The Defendants identified in this Count shall be referred to as "ELCRA DEFENDANTS".

165.    The ELCRA DEFENDANTS were under a statutory duty to either provide water services to Plaintiff's Decedent as a water user so that she would not be denied the full and equal enjoyment of public water service on account of race, or

they aided and abetted the public service provider to deny Plaintiff's Decedent full and equal enjoyment of public water service an account of race.

166.    In 2013, the ELCRA DEFENDANTS were required to develop an Interim Plan to deliver water to Genesee County and Flint while the KWA water system was being built. This Interim Plan would be in effect for more than 2.5 years (April 25, 2014 until approximately October 2016 when the KWA water system would become operational).

167.    The ELCRA DEFENDANTS knew that the water from the Flint River was grossly inferior to the water Flint and Genesee County citizens had been receiving from DWSD.

168.    The ELCRA DEFENDANTS knew that the water from the Flint River would have to be processed at the Flint WTP which required millions of dollars of upgrades.

169.    The ELCRA DEFENDANTS knew that using the raw water from the Flint River had been rejected as recently as 2011.

170.    Recognizing these facts, the ELCRA DEFENDANTS devised or acquiesced to an Interim Plan that allowed the predominately white water users of Genesee County to receive the safe superior water from DWSD and the predominately black water users of Flint would have to accept during the interim period grossly inferior, previously rejected and potentially unsafe Flint River water.

171.     There was no rational economic justification for treating the predominately white water users from those areas of Genesee County outside of Flint differently than the users of water from Flint, a predominately African American community. This is so because the cost of continuing with the finished water product from the DWSD for all water users (both Genesee County and Flint) would have been substantially less than the cost of upgrading the Flint WTP in order to safely process (assuming this was possible) the raw Flint River water.

172.     Given the unexplained difference in treatment between these two groups of similarly situated water users, considering the absence of any rational economic or fiscal justification, and taking into account the racial makeup of the community that received the grossly inferior and dangerous water product, the deliberate decisions and actions of these conspiring Defendants in devising the Interim Plan can fairly be said to be the product of racial discrimination in violation of MCL 37.2302(a).

173.     Assuming that the policy to supply different quality water to the water users of Flint and the surrounding communities was race neutral, the ELCRA DEFENDANTS are liable under the MCL 37.2302(a) because the impact of that policy had a grossly disparate negative impact on the predominately African- American and poor water users in the City of Flint.

174.    The ELCRA DEFENDANTS' liability to the Plaintiff's Decedent includes, without limitation, bacterial infections including *Legionella* and related disorders causing injuries and death.

175.    As a direct and proximate result of Defendant's unconstitutional acts alleged in this Complaint, the Estate of Odie Brown demands compensation for violations of Odie Brown's fundamental rights pursuant to the ELCRA, including, but not limited to those specifically set forth in Paragraphs 118 and 119 above.

## COUNT VI

### LAN PC, LAN INC. & LAD - ONLY
### PROFESSIONAL NEGLIGENCE

174.    Plaintiffs incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

175.    The LAN Defendants undertook, for consideration, to render services for the City of Flint, which they should have recognized as necessary for the protection of Plaintiff's Decedent and her property.

176.    The LAN Defendants undertook to perform a duty owed to Plaintiff's Decedent by the City of Flint and/or the State of Michigan. Additionally, the LAN Defendants, in undertaking to perform services related to the Flint water supply and in making public statements about the safety of the Flint water supply, assumed a duty directly to the Plaintiff's Decedent and the public at large.

177.    Based on their undertaking, the LAN Defendants had a duty to Plaintiff's Decedent, as a public water user in the City of Flint, to exercise that degree of care consistent with the greater degree of knowledge and skill possessed by design professionals, as well as an ethical duty to report to public authorities the dangers posed to public health and property that would result from the failure to install and/or operate a proper anti-corrosive treatment when using the Flint River as a primary source of drinking water.

178.    The LAN Defendants also owed a duty to Plaintiff's Decedent to notify  the proper authorities of unethical illegal practices of others whose actions or decisions posed threats to public health and property that would result from the failure to install and/or operate a proper anti-corrosive treatment when using the Flint River as a primary source of drinking water.

179.    The LAN Defendants' duties to Plaintiff's Decedent included, but were not limited to, a duty to properly administer the placing of the FWTP into operation using the Flint River as a primary source, a duty to do so in such a manner that would not endanger the health and property of Plaintiff's Decedent, a duty to take other actions consistent with the greater degree of knowledge and skill possessed by design professionals, and/or the duty to report to public authorities the dangers posed to public health and property that would result from the failure to install and/or provide proper anti-corrosive treatment when using the Flint River as a primary source of drinking water.

180.    Plaintiff's Decedent relied on the LAN Defendants to perform their duties.

181.    The LAN Defendants failed to exercise reasonable care in performing their duties, including in preparing for and executing the transition from treated DWSD water to untreated Flint River water, which was unsafe, toxic and unsuitable for human use.

182.    The LAN Defendants failed to undertake reasonable care and conduct as a professional engineering firm.

183.    The LAN Defendants failed to exercise reasonable care when they did not ensure that corrosion control measures were implemented in a water supply system containing lead pipes that was being transitioned onto a highly corrosive water source.

184.    The LAN Defendants failed to exercise reasonable care when they failed to conduct a root cause analysis which would have uncovered that the source of the TTHM was corrosive water coursing through the City's pipes, which also would cause the release of lead and *legionella*.

185.    The LAN Defendants failed to exercise reasonable care when they failed to recommend the addition of phosphates to the water.

186.    The LAN Defendants failed to exercise reasonable care when they failed to recommend that the City use a coagulant other than ferric chloride.

187.    The LAN Defendants failed to exercise reasonable care for other reasons alleged throughout this complaint, including ignoring at least several red flags that should have alerted them to the relevant problems.

188.    Plaintiff's Decedent suffered harm resulting from the LAN Defendant's failures to exercise reasonable care.

189.    The LAN Defendants' failure to exercise reasonable care was direct and proximate cause of the Plaintiff's Decedent's injuries, which were entirely foreseeable.

190.    The LAN Defendants are liable to Plaintiff's Decedent for all harms resulting to them from the LAN Defendants' failures to exercise reasonable care.

191.    As a direct and proximate result of the unconstitutional acts of these Defendants as alleged in this Complaint, Plaintiff demands compensation for violations of her decedent's fundamental rights to bodily integrity, property and liberty interests, including, but not limited to:

      a.    Serious life-threatening disease, culminating in death of Odie Brown;

      b.    Serious life-threatening disease, culminating in death of Odie Brown;

      c.    Pain and suffering, including mental suffering and anguish to Odie Brown;

      d.    The loss of the love, society, companionship, and affection of Odie Brown sustained by her next of kin, i.e. by her children, siblings, and grandchildren; and

      e.    Pecuniary damages, including but not limited to, hospital, medical, funeral, and burial expenses.

## COUNT VII

### VEOLIA DEFENDANTS
### PROFESSIONAL NEGLIGENCE

192.    Plaintiff incorporates by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

193.    Plaintiff brings this cause of action against the Veolia Defendants. The Veolia Defendants undertook, for consideration, to render services for the City of Flint, which was necessary for the protection of Plaintiff's Decedent.

194.    The Veolia Defendants had a duty to Plaintiff's Decedent to exercise reasonable care.

195.    The Veolia Defendants failed to reasonable care as a professional engineering firm and, in fact acted unreasonably in the following respects, among other

    a. In inspecting the city's water system;

    b. In issuing its interim and final reports;

    c. In its declaration that Flint's drinking water met federal and/or state and/or all applicable requirements;

    d. In its representation that Flint's drinking water was safe;

    e. In discounting the possibility that problems with Flint's water supply were causing medical harm as well as property and monetary damage;

    f.  In its failure to warn regarding the dangers of lead leaching into Flint's water system;

    g.  In its failure to urgently recommend the immediate implementation of corrosion control for purposes of preventing lead contamination in Flint's water supply;

    h.  In its failure to conduct a root cause analysis which would have uncovered that the source of the TTHM was corrosive water coursing through the City's pipes and caused the release of *legionella*;

    i.  In its failure to urgently recommend the addition of phosphates to the water; and

    j.  In its failure to recommend that the City use a coagulant other than ferric chloride.

196.    Plaintiffs suffered harm resulting from the Veolia Defendants' failures to exercise reasonable care to protect its undertaking.

197.    The Veolia Defendants' failure to exercise reasonable care to protect Flint water users directly and proximately caused the Plaintiff's injuries and were entirely foreseeable.

198.    The Veolia Defendants are liable to Plaintiff for all harms resulting to them from their failures to exercise reasonable care.

199.    As a direct and proximate result of the unconstitutional acts of these Defendants as alleged in this Complaint, Plaintiff demands compensation for her Decedent's damages and injuries, as enumerated and set forth under Paragraph 191 above.

## COUNT VIII

### ENGINEERING DEFENDANTS GROSS NEGLIGENCE

200.    Plaintiff incorporates by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

201.    The Engineering Defendants owed Plaintiff a duty to exercise reasonable care. Upon learning of the release of the contaminants, the Engineering Defendants owed Plaintiff a duty to act reasonably to remediate, contain, and eliminate the contamination before it injured Plaintiff.

202.    As alleged herein, the Engineering Defendants, individually and collectively, caused drinking water with concentrations of lead exceeding applicable standards, and *legionella*, to be provided to Plaintiff and in contravention of federal environmental statutes and guidelines. As such, the Engineering Defendants gross negligently, recklessly, wilfully, wantonly, and/or intentionally contaminated drink.

203.    The Engineering Defendants owed Plaintiff's Decedent a duty to act with reasonable care in undertaking their obligations. As professional engineers, the Engineering Defendants had a duty to act as an engineer of ordinary learning.

204.    As more fully described herein, the Engineering Defendants breached their duties of care by:

> a. Failing to conduct a root cause analysis which would have revealed that the pipes were corroding and causing lead and *legionella* to enter the residents' homes and commercial buildings serving the public;

    b. Failing to recognize at least several red flags that should alert a prudent engineer to extensive corrosion problems and lead to implementation of effective protective measures;

    c. Failing to advise the City that they were out of compliance with the Safe Drinking Water Act's Lead and Copper Rule;

    d. Failing to advise the City that the addition of a corrosion inhibitor was necessary to prevent lead poisoning and Legionnaires Disease; and

    e. Advising the City to use or even increase the dosage of highly acidic ferric chloride, rather than advising that the pH of the water should be increased.

205.    Defendants' conduct was so reckless as to demonstrate a substantial lack of concern for whether injury would result to Plaintiff.

206.    As a direct and proximate result of the Engineering Defendants' gross negligence, Plaintiff was were injured as alleged in Paragraph 191 above.

## COUNT IX

## NEGLIGENCE-McLAREN HOSPITAL

207.    McLaren Hospital was open, accessible, and available to the public, which would be exposed to water provided by that facility.

208.    Beginning in April, 2014, McLaren's source of water came from the FWTP which utilized water from the Flint River.

209.    By the summer of 2014, and certainly by the fall of 2014, McLaren was well aware that there was a substantial increase in the number of fatal and non-fatal cases

of Legionnaires Disease and that the increase coincided with the introduction of Flint River water as a source of drinking water for the Flint population.

210.    In the summer and fall of 2014, McLaren was knew that its hospital water system was tainted with legionella and that multiple patients were acquiring Legionella pneumonia from its hospital.  Though McLaren warned its employees about the presence of Legionella in its water system it failed to warn its patients, visitors, and embers of the general public.

211.    McLaren had a duty to provide safe water to its patients but negligently failed to take proper steps to provide safe water for its patients.

212.    By the summer and fall of 2014, McLaren had sufficient knowledge of the  risks associated with exposure to the deadly *legionella* bacteria emanating from use of the Flint River water and its own hospital water supply, and accordingly had a duty to take corrective action and so inform  its  patients  of  this  serious  risk  of  injury,  but failed  to  take proper corrective action or inform its patients of the risks and hazards of the legionella which was present in its water hospital.

213.    As a result of this negligence, Plaintiff have experienced all the injuries and damages as alleged in Paragraph 191 above.

## COUNT X

**GROSS NEGLIGENCE & 1983 – 14th Am CLAIM
HURLEY DEFENDANTS BIRCHMEIER & NEWELL**

214.    Hurley Medical Center / Hospital was open, accessible, and available to the public, which would be exposed to water provided by that facility.

215.    Defendant Birchmeier, as the Hospital's Director of Facilities and Support Services, oversaw and was responsible for ensuring that the hospital's water supply was safe and clean for its invitees and patients, including Odie Brown.

216.    Defendant Newell, the Hospital's Infection Control Manager, was also responsible for ensuring that the hospital's water supply was safe and clean for its invitees and patients, including Odie Brown.

217.    Prior to Plaintiff's Decedent's exposure to Legionella bacteria while a patient at Hurley Hospital in the fall and/or winter of 2014, the Hurley Defendants knew:

a. Beginning in April, 2014, Hurley's source of water came from the FWTP which utilized water from the Flint River, which was known to be contaminated with legionella bacteria and other hazardous chemicals and bacteria known cause and/or be associated with the proliferation of legionella;

b. Hurley Hospital (as well as McLaren Flint Hospital) was / were physically located at the end of Flint's water distribution system, thereby increasing the risk of legionella in the hospital's water supply;

c. The increased temperature of the Flint River water in the water distribution system further increased the risk of legionella in the hospital's water supply;

d. The increased stagnation and retention period of the hospital's water supply further increased the risk of legionella;

e. There was a substantial increase in the number of fatal and non-fatal cases of Legionnaires Disease both in the county and at Hurley and McLaren hospitals, and that the increase coincided with the introduction of Flint River water as a source of drinking water for the Flint population

f. They were not providing any type of testing, inspecting, remediation, correction, or treatment of the hospital's water supply to prevent or control the presence of hazardous chemicals and bacteria, including legionella bacteria;

g. They were not advising or warning its hospital patients and visitors of the hospital's contaminated and hazardous water and the risk of legionella the patient will be subjected to be visiting Hurley Defendants' Hospital

218.    By the summer and fall of 2014, Hurley had sufficient knowledge of the risks associated with exposure to the deadly *legionella* bacteria emanating from use of the Flint River water and its own hospital water supply, and accordingly had a duty to take corrective action and so inform its patients of this serious risk of injury, but failed to take proper corrective action or inform its patients of the hidden risks and hazards of the legionella which was present in its water hospital.

219.    Hurley Defendants' failure to inspect, test, correct, and treat its hospital water supply which was known to be contaminated with hazardous substances, including legionella bacteria and/or was known to be at significant risk for legionella bacteria, amounted to a reckless disregard for whether injury result to Plaintiff's Decedent and therefore was gross negligence as defined under MCL 691.1407, which caused Plaintiff and Plaintiff's Decedent to experience the injuries and damages as enumerated and set froth in Paragraph 191 above.

220.    Plaintiff further submits that the Hurley Defendants, as employees and/or agents of a municipally owned hospital, were acting under color of law, and thus their actions and inactions as described above likewise amount to violations of the 14th

Amendment of the U.S. Constitution and §1983 for violation of Plaintiff's Decedent's body integrity, equal protection of the law, state created danger, and denial of access to judicial remedies, as set forth in the above federal counts for the Government Defendants.

## <u>REQUEST FOR RELIEF</u>

Plaintiff demands the following relief against all Defendants, for the violation of their rights as set forth herein:

a.   A declaration that Defendants violated the legal rights of Plaintiff' Decedent;

b.   Whatever amount of monetary compensatory damages the jury may determine as fair, reasonable and just compensatory damages for the wrongful death claim, Decedent's conscious pain and suffering, the heirs' loss of Decedent's society and companionship; and the funeral, burial, and medical expenses incurred;

c.   Punitive damages against these Defendants for their unconscionable and willful misconduct creating the conditions causing injury to Plaintiffs and for the resulting cover-up and dishonesty in concealing the true nature and scope of the public health crisis caused by them;

d.   Such other and further relief as is just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury as to all those issues triable as of right.

                      Respectfully submitted,

                      /s/ Todd J. Weglarz
                      Todd J. Weglarz (P48035)
                      Geoffrey N. Fieger (P30441)
                      FIEGER LAW
                      Attorneys for Plaintiff
                      19390 West Ten Mile Road
                      Southfield, MI 48075
Dated: March 2, 2018        (248) 355-5555