# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| *In re* Flint Water Cases. | Judith E. Levy<br>United States District Judge |

_____/

This Order Relates To:

Brown v. Snyder, et al.
Case No. 18-10726

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS PLAINTIFF'S SHORT-FORM COMPLAINT

This is one of the many cases that are collectively referred to as the

Flint Water Cases. Defendants, a combination of private and public

individuals and entities, allegedly set in motion a chain of events that led

to bacteria and lead leaching into the City of Flint's drinking water.

Plaintiffs claim that Defendants subsequently concealed, ignored, or

downplayed the risks that arose from their conduct, causing them serious

harm. These plaintiffs contend that the impact of what has since been

called the Flint Water Crisis is still with them and continues to cause

them problems.

This Court has previously adjudicated other motions to dismiss in the Flint Water Cases. First, there was *Guertin v. Michigan*, No. 16-cv-12412, involving two individual plaintiffs and many of the same claims and Defendants in the present case. Next, there was *Carthan v. Snyder*, No. 16-cv-10444, a consolidated class action that also involved similar Defendants and claims. Most recently were *Walters v. City of Flint*, No. 17-cv-10164, and *Sirls v. Michigan*, No. 17-cv-10342, which involved individual plaintiffs and the same Master Complaint as the present case.

This case involves similar underlying facts, claims, and Defendants as in other Flint Water Cases. Accordingly, this opinion will rely on the Court's earlier rulings to resolve the current motions where appropriate. But importantly, the focus in this case is on *legionella* bacteria, and includes McLaren Regional Medical Center and Hurley Medical Center as Defendants. The Plaintiff here is the Estate of Odie Brown, and so this opinion will describe Plaintiff's legal claims and then explain why a similar or different result is justified based on the factual allegations pleaded here. For the reasons set forth below, the Court grants in part and denies in part Defendants' motions to dismiss the complaint.

## I.    Procedural History

Plaintiff originally filed this lawsuit in early 2018. At that time, it was one of many individual Flint Water cases. As the number of lawsuits grew, the Court appointed co-liaison lead counsel to coordinate the individual lawsuits. It also directed co-liaison lead counsel to file a Master Complaint that would apply to all pending and future non-class action cases.[1] The attorneys in each of these cases were ordered to also file a Short Form Complaint, adopting only the pertinent allegations from the Master Complaint as they saw fit. The Short Form Complaints also allowed for an Addendum if any plaintiffs wished to allege a new cause of action or include additional defendants. This would allow the Court to issue opinions that would apply to multiple individual cases, rather than to address each case in turn and cause a delay in the administration of justice.

After the Court ruled on motions to dismiss in *Walters v. City of Flint*, No. 17-cv-10164 and *Sirls v. Michigan*, No. 17-cv-10342, the Court instructed Plaintiff to amend its complaint in this case using the Short

---

[1] The Court put in place a similar process to manage the putative class action side of the Flint Water cases. *See Carthan v. Snyder*, No. 16-cv-10444. In *Carthan*, the Court granted in part and denied in part the Defendants' motions to dismiss. 384 F. Supp.3d 802 (E.D. Mich. 2019).

Form Complaint from *Walters* and *Sirls*, which Plaintiff did on September 10, 2019.[2] Plaintiff adopted the Master Complaint from *Walters* in full and included an Addendum with new allegations and defendants. (ECF No. 73.) Soon after, Defendants moved to dismiss the complaint and on January 22, 2020, the Court heard oral argument on the motions.

## II. Background

### A. The Parties

Plaintiff in this case is the Estate of Odie Brown, brought by Cholyonda Brown who is the daughter and personal representative of

---

[2] Plaintiff's counsel filed this complaint one day after the filing date set by the Court. The MDEQ Defendants argue that the complaint should be dismissed as untimely. (ECF No. 91, PageID.1328.) In response, Plaintiff's counsel asked the Court to accept the late filing. (ECF No. 101, PageID.1557.) Rule 6(b) of the Federal Rules of Civil Procedure provides that when a party moves a court to accept a filing after the relevant deadline, the court may do so where the failure to meet the deadline was the result of "excusable neglect." Fed. R. Civ. P. 6(b). The governing legal standard for excusable neglect is a balance of five factors: (1) the danger of prejudice to the nonmoving party, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, (4) whether the delay was within the reasonable control of the moving party, and (5) whether the late-filing party acted in good faith. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993). Plaintiff's counsel states that they had technical difficulties, and so submitted the complaint at 12:24am, 24 minutes after it was due. Given that there was only a 24-minute delay, there is no risk of prejudice to Defendants. The Court finds excusable neglect and accepts Plaintiff's late filing. MDEQ's request for dismissal on this basis is therefore denied.

Odie Brown. Odie Brown was a resident of Flint who died from Legionnaires' disease on January 9, 2015. Plaintiff contends that Odie Brown's death resulted from exposure to Flint's contaminated water. Plaintiff sues the following individuals and entities:

*The State Defendants*. The State Defendants include Rick Snyder, the former Governor of Michigan;[3] Andy Dillon, former Treasurer for the State of Michigan; and Nick Lyon, the former Director of the Michigan Department of Health and Human Services ("MDHHS").

*The MDEQ Defendants*. Michigan Department of Environmental Quality ("MDEQ") Defendants include Liane Shekter Smith,[4] MDEQ Chief of the Office of Drinking Water and Municipal Assistance; Stephen Busch, an MDEQ District Supervisor; Patrick Cook, a former specialist for the Community Drinking Water Unit; Michael Prysby, a former

---

[3] Plaintiff sues former Governor Snyder in his official and individual capacities. For the sake of consistency with earlier Flint Water decisions, former Governor Snyder will be referred to as Governor Snyder or the Governor where the claim against him is in his individual capacity. Where the claim is against him in his official capacity, the claim is now against Governor Gretchen Whitmer. *See* Fed. R. Civ. P. 25(d). But, again, for consistency, the Court will still refer to Governor Snyder.

[4] In this Court's prior opinions, Shekter Smith's name was set forth as "Shekter-Smith." When quoting these past opinions, the Court will maintain the original spelling so as to avoid confusion.

Environmental Quality District 8 Water Supervisor; and Adam Rosenthal,[5] a former water quality analyst for the MDEQ.[6]

*The City Defendants.* The City Defendants include Darnell Earley, Emergency Manager from November 2013 to January 2015; Gerald Ambrose, Emergency Manager from January 2015 to April 2015; Dayne Walling, Mayor of Flint from August 2009 to November 2015; Howard Croft, Flint's former Director of Public Works; Michael Glasgow, the former City of Flint Laboratory and Water Quality Supervisor; Daugherty Johnson, Flint's former Utilities Administrator; and the City of Flint.[7]

---

[5] Adam Rosenthal answered the complaint on October 4, 2019. (ECF No. 87.) He later filed a notice of joinder to the MDEQ Defendants' motion to dismiss. (ECF No. 94.) The Court informed Rosenthal's counsel at oral argument that it would not consider the joinder as an independent motion to dismiss because Rosenthal answered the complaint. Rosenthal has not sought to withdraw his answer or otherwise clarify his position, and so he is deemed to have answered and his joinder notice is denied because he waived his right to move to dismiss under Federal Rule of Civil Procedure 12(h).

[6] Plaintiff originally brought claims against MDEQ Defendant Bradley Wurfel but later stipulated to his dismissal. (ECF No. 131.)

[7] Plaintiff named Edward Kurtz as a defendant in its Addendum to the Short Form Complaint, (ECF No. 73, PageID.342) but did not properly name him as a defendant on the Short Form Complaint itself. Paragraph 13 of the Short Form Complaint clearly instructs a plaintiff to name additional defendants in the space provided. (ECF No. 73, PageID.336.) Because Kurtz was not properly named, he is not a defendant in this case.

*Jeff Wright*. Wright is the Genesee County Drain Commissioner and Chief Executive Officer of the Karegnondi Water Authority ("KWA").

*The Hurley Defendants*. The Hurley Defendants include the City of Flint Board of Hospital Managers doing business as Hurley Medical Center ("Hurley"); Norb Birchmeier, the Director of Facilities and Support Services for Hurley; and Ann Newell, the Infection Control Manager at Hurley. Hurley is a municipally owned hospital in the City of Flint, and is one of the two sites where Plaintiff alleges Odie Brown was exposed to *legionella* bacteria.

*The Private Defendants*. The private defendants include Lockwood, Andrews & Newman, PC, Lockwood Andrews & Newman, Inc., and the Leo. A. Daly Company (collectively "LAN"); and McLaren Regional Medical Hospital ("McLaren"). LAN performed work as a consultant related to Flint's transition to the Flint River and continued to advise Flint on water quality issues during the Flint Water Crisis. McLaren is a major hospital in the City of Flint, and is one of the two sites where Plaintiff alleges Odie Brown was exposed to *legionella* bacteria.

**B.   The Facts**

Plaintiff's Short Form Complaint fully adopts the relevant facts alleged in the Master Complaint from *Walters*. (*Walters*, No. 17-cv-10164, ECF No. 185-2.) In addition to the Master Complaint and Short Form Complaint, Plaintiff's Addendum asserts two additional counts against Defendants McLaren and Hurley.[8] The Government Defendants, LAN, and the Hurley Defendants moved to dismiss, and McLaren answered the complaint. (ECF Nos. 90, 92.)

The Master Complaint's facts, setting forth the background of the Flint Water Crisis, were summarized in this Court's opinion in *Walters* and will not be reproduced here. *Walters v. City of Flint*, No. 17-cv-10164, 2019 WL 3530874, at *4–*11 (E.D. Mich. Aug. 2, 2019). However, unlike *Walters*, Plaintiff does not allege injuries from lead poisoning. Also, unlike *Walters*, many of the events and actions after January 2015 are not relevant here because Odie Brown died on January 9, 2015.

---

[8] At the end of the Short Form Complaint, Plaintiff included a paragraph alleging the following counts against the Hurley Defendants: "body [sic] integrity, equal protection of the law, state created danger, and denial of access to judicial remedies." (ECF No. 73, PageID.357). Beyond this short paragraph, Plaintiff does not include any additional factual allegations as to any of these counts. These claims are dismissed for being bare assertions lacking "further factual enhancement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

*Odie Brown's Death from Legionnaires' Disease*

Odie Brown was 65 years old when she died of Legionnaires' disease. (ECF No. 73, PageID.339.) Legionnaires' disease is a severe type of pneumonia. Individuals can get the disease if they breathe in water droplets containing *legionella* bacteria or if *legionella*-contaminated water enters their lungs while drinking. (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5131.)

Brown, a resident of Flint, was diagnosed with Legionnaires' disease at Hurley on December 25, 2014. (ECF No. 73, PageID.339.) Before that, Brown had been hospitalized at both McLaren and Hurley. (*Id.*) She was first admitted to McLaren in September 2014, and was subsequently hospitalized at Hurley several times from late September 2014, until her death in January 2015. (*Id.*) Plaintiff alleges that Odie Brown died as a result of exposure to contaminated Flint River water either as a patient at McLaren or Hurley. (*Id.*) Both hospitals used the City of Flint's water which was sourced from the Flint River beginning in April 2014. (*Id.* at PageID.347, 355.)

Plaintiff brings a gross negligence claim against Hurley Medical Center along with two of its employees, Defendants Birchmeier and

Newell. (ECF No. 73, PageID.355.) According to Plaintiff, Birchmeier and Newell oversaw and were responsible for ensuring that the hospital's water supply was safe and clean for its patients. (*Id.* at PageID.345.) The Hurley Defendants knew by summer of 2014 that there was a significant increase in reported cases of Legionnaires' disease in Genesee County and at the two major Flint hospitals, McLaren and Hurley. (*Id.* at PageID.356.) The increase in Legionnaires' disease cases coincided with the introduction of the Flint River as the City's water source. Plaintiff contends that the Hurley Defendants were aware that *legionella* was in its water supply and did not take steps to warn Odie Brown or make its premises safe. (*Id.* at PageID.338.)

## C.    **Prior Flint Water Cases**

The Flint Water Cases have already produced several Sixth Circuit opinions. These are binding on this Court and include *Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019); *Boler v. Earley*, 865 F.3d 391 (6th Cir. 2017); and *Mays v. City of Flint*, 871 F.3d 437 (6th Cir. 2017). The Court will also adhere to its own prior decisions where appropriate, including *Guertin v. Michigan*, No. 16-cv-12412, 2017 WL 2418007 (E.D. Mich. June 5, 2017); *Carthan v. Snyder*, 329 F. Supp. 3d 369 (E.D. Mich.

2018); *Carthan v. Snyder*, 384 F. Supp. 3d 802 (E.D. Mich. 2019); and *Walters v. City of Flint*, No. 17-cv-10164, 2019 WL 3530874 (E.D. Mich. Aug. 2, 2019).

## III. Standard of Review

When deciding a motion to dismiss under Federal Rule of Procedure 12(b)(6), the Court must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.,* 684 F.3d 605, 608 (6th Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff's claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

## IV. Threshold Issues

## A. Immunity

*Sovereign Immunity*. Governor Snyder moves to dismiss on the basis of sovereign immunity.[9] Governor Snyder argues that sovereign immunity deprives the Court of jurisdiction to hear claims for injunctive relief against him in his official capacity. He argues that, unlike in earlier Flint Water cases, Plaintiff is not bringing this case for prospective relief in order to "prevent future federal constitutional or statutory violations" as required by the *Ex parte Young* exception to sovereign immunity. *Boler*, 865 F.3d at 412 (citing *Ex parte Young*, 209 U.S. 123 (1908)). Odie Brown is deceased, and her estate does not allege that there is an ongoing violation of federal law.

Plaintiff contends that by adopting the Master Complaint, the estate seeks the "same injunctive relief" sought by plaintiffs in *Walters*. (ECF No. 107, PageID.1808.) Plaintiff argues that the result should be the same as in *Walters* where the Court found that Governor Snyder was not entitled to sovereign immunity. But this case is quite different from *Walters*. The Master Complaint seeks the following injunctive relief: "An

---

[9] As a challenge to the Court's subject matter jurisdiction, Governor Snyder's motion is brought pursuant to Federal Rule of Civil Procedure 12(b)(1).

injunctive order to remediate the harm caused by Defendants' unconstitutional conduct including, but not limited to: repairs of private property and establishment of medical monitoring to provide health care and other appropriate services to Plaintiffs for a period of time deemed appropriate by the Court[.]" (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5247.) Plaintiff does not explain how the estate requires the repair of private property, medical monitoring, or the like. Accordingly, Plaintiff's official capacity claim against Governor Snyder must be dismissed.

*Qualified Immunity.* State, MDEQ, and City Defendants argue that they should be granted qualified immunity regardless of whether Plaintiff has stated a valid bodily integrity claim against them. (ECF No. 83, PageID.428–431); (ECF No. 84, PageID.975–976); (ECF No. 91, PageID.1328–1335.) The Court considered and rejected substantially similar arguments in *Walters*. 2019 WL 3530874, at *19. Because the right to bodily integrity is clearly established, Defendants cannot rely on qualified immunity if Plaintiff states a valid claim against them.

## V.  Analysis

### A.  Professional Negligence

LAN Defendants move to dismiss Plaintiff's professional negligence claim. (ECF No. 86.)[10] In so doing, they incorporate and rely upon all of their prior arguments, acknowledging that the Court rejected these arguments in *Walters*. (*Id.* at PageID.1164); *Walters*, 2019 WL 3530874, at *40. Because there is no reason to diverge from prior decisions, LAN's motion to dismiss this count is denied.

## B. Bodily Integrity

Plaintiff adopted the bodily integrity claim from the Master Complaint in *Walters* and similarly brings this claim against all Government Defendants. (ECF No. 73, PageID.331–332, 334); (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5211–5213.) Defendants all move to dismiss. (ECF No. 79, PageID.368); (ECF No. 83, PageID.436–444); (ECF No. 84, PageID.971); (ECF No. 89); (ECF No. 90,

---

[10] The LAN Defendants also move for an order dismissing Plaintiff's claims for lack of personal jurisdiction, lack of subject matter jurisdiction, and for a more definite statement under Federal Rules of Civil Procedure 12(b)(2), 12(b)(1), and 12(e) respectively. (ECF No. 85.) LAN Defendants do not brief their argument on the 12(b)(1) subject matter jurisdiction issue. They concede that the Court previously rejected their personal jurisdiction and more definitive statement arguments, and so LAN brings them solely to preserve their claim on appeal. Therefore, the Court will not address these arguments.

PageID.1289–1295);[11] (ECF No. 91, PageID.1333–1343.) Because Plaintiff has alleged no additional facts beyond those set out in the Master Complaint, the bodily integrity claims against the following Defendants are dismissed for the same reasons they were dismissed in *Walters*: Lyon, Wright, and Walling. 2019 WL 3530874, at *36, *38–*39. Each of the remaining Defendants will be addressed below.

The Court has addressed the right to bodily integrity on several prior occasions. Recently in *Carthan* and *Walters* the Court set forth the governing legal standard for such a claim:

> The right to bodily integrity is a fundamental interest protected by the Due Process Clause of the Fourteenth Amendment. *Guertin*, 912 F.3d at 918–19; *Guertin*, 2017 U.S. Dist. LEXIS 85544, at *63 (citing *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891)). And although violations of the right to bodily integrity usually arise in the context of physical punishment, the scope of the right is not limited to that context. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1062–63 (6th Cir. 1998). For instance, the "forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Guertin*, 912 F.3d at 919 (citing *Washington v. Harper*, 494 U.S. 210, 229 (1990)). And "compulsory treatment with anti-psychotic drugs may [also] invade a patient's interest in bodily integrity." *Guertin*, 2017 U.S. Dist. LEXIS 85544, at *66 (citing *Lojuk v. Quandt*, 706 F.2d 1456, 1465–66 (7th Cir. 1983)). The key is whether the intrusion is consensual. *See*

---

[11] The bodily integrity claim against the Hurley Defendants is dismissed for reasons set forth in Section II.B. n.8.

*Guertin*, 912 F.3d at 920. There is no difference between the forced invasion of a person's body and misleading that person into consuming a substance involuntarily. *Guertin*, 2017 U.S. Dist. LEXIS 85544, at *71 (citing *Heinrich v. Sweet*, 62 F. Supp. 2d 282, 313–14 (D. Mass. 1999)). As such, officials can violate an individual's bodily integrity by introducing life-threatening substances into that person's body without their consent. *Guertin*, 2017 U.S. Dist. LEXIS 85544, at *65 (citing *Washington*, 494 U.S. at 229).

However, to state a claim, plaintiffs must do more than point to the violation of a protected interest; they must also demonstrate that it was infringed arbitrarily. *Guertin*, 912 F.3d at 922. *But see Range v. Douglas*, 763 F.3d 573, 589 (6th Cir. 2014) (observing that in some contexts government action may violate substantive due process without a liberty interest at stake). And with executive action, as here, only the most egregious conduct can be classified as unconstitutionally arbitrary. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). In legal terms, the conduct must "shock[ ] the conscience." *Guertin*, 2017 U.S. Dist. LEXIS 85544, at *63 (quoting Lewis, 523 U.S. at 846).

Whether government action shocks the conscience depends on the situation. *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002). Where unforeseen circumstances demand the immediate judgment of an executive official, liability turns on whether decisions were made "maliciously and sadistically for the very purpose of causing harm." *Lewis*, 523 U.S. at 852–53 (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). But where an executive official has time for deliberation before acting, conduct taken with "deliberate indifference" to the rights of others "shocks the conscience." *See Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000). This case involves the latter of these two situations. And as a result, plaintiffs must demonstrate that (1) officials knew of facts from which they could infer a "substantial risk of serious harm," (2) that they did infer it, and (3) that they nonetheless

acted with indifference, *Range*, 763 F.3d at 591 (citing *Ewolski*, 287 F.3d at 513), demonstrating a callous disregard towards the rights of those affected, *Guertin*, 912 F.3d at 924 (quoting *Schroder v. City of Fort Thomas*, 412 F.3d 724, 730 (6th Cir. 2005)).

*Walters*, 2019 WL 3530874, at *14–*15 (citing *Carthan*, 384 F. Supp. 3d at 839–40). The same legal standard applies here.

The main difference between *Carthan* and *Walters* and this case is that Plaintiff does not allege injuries from lead exposure. Instead, Plaintiff alleges that Odie Brown's death was caused by the *legionella* bacteria from the City of Flint's water supply.

The fact that Odie Brown did not suffer lead poisoning but rather died from Legionnaires' disease does not change the core of this Court's prior bodily integrity analysis. Plaintiff plausibly alleges the connection between *legionella* bacteria and the Flint Water Crisis—contending that *legionella* was responsible for at least nine deaths and 87 infections. (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5155.) Plaintiff claims that "[e]xtensive studies of *[l]egionella* have established that the pathogen enters the water supply when the 'bio-film' protecting pipes is stripped away, which is exactly what happened when the River's corrosive water entered the City's pipes." (*Id.* at PageID.5131.) Further,

Plaintiff contends that outbreaks of Legionnaires' disease are rare unless pipes are stripped of their "bio-film" by corrosive water. (*Id*. at. PageID.5144.) The State Defendants contest the connection between the Flint Water Crisis and 2014-2015 *legionella* outbreak, arguing that the source of the bacteria was from McLaren Hospital. (ECF No. 83, PageID.408.) But for a motion to dismiss, the Court must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.,* 684 F.3d 605, 608 (6th Cir. 2012). Plaintiff has plausibly alleged the connection between the switch to Flint River water and the Legionnaires' disease outbreak in Flint.

The State and MDEQ Defendants argue that the Court should decide these *legionella*-related cases differently from lead injury cases. (ECF No. 83, PageID.442, 444); (ECF No. 91, PageID.1310–1312.) Yet as the Court said in *Carthan*, "[t]his is not a case about the right to a contaminant-free environment or clean water. Rather, this case implicates the consumption of life-threatening substances. Indeed, neither side disagrees that lead and *legionella* are life threatening, nor that plaintiffs ingested these contaminants and others through the water supply." 384 F. Supp. 3d at 840 (internal citations removed). Similarly,

as the Sixth Circuit held in *Guertin*, a related Flint Water Case: "Involuntarily subjecting nonconsenting individuals to foreign substances with no known therapeutic value—often under false pretenses and with deceptive practices hiding the nature of the interference—is a classic example of invading the core of the bodily integrity protection." *Guertin v. State*, 912 F.3d 907, 920–21 (6th Cir. 2019). Plaintiff plausibly alleges that the presence of *legionella* bacteria in Flint was a foreseeable result of the April 2014 switch to Flint River water. Because Defendants allegedly hid the fact that Flint's water contained life-threatening substances like lead and *legionella*, and because under state and municipal law, Plaintiff was not permitted to receive water in any other way, Flint Code of Ord. §§ 46-25, 46-26, 46-50(b), Plaintiff's claim implicates the right to bodily integrity. *See Walters*, 2019 WL 3530874, at *15.

In *Guertin*, the Sixth Circuit also found *Cincinnati Radiation Litigation* "especially analogous" to circumstances surrounding the Flint Water Crisis. *Guertin v. State*, 912 F.3d 907, 921 (6th Cir. 2019) (citing *In re Cincinnati Radiation Litigation*, 874 F. Supp. 796 (S.D. Ohio 1995)). In *Cincinnati Radiation*, government officials subjected cancer patients

to radiation doses consistent with those expected to be inflicted upon military personnel during a nuclear war. 874 F. Supp. at 802–04. The government actors never disclosed the risks or obtained consent to irradiate patients at those levels for those purposes—they instead told the patients that the radiation was treatment for their cancer. *Id.* at 803–04. The *Cincinnati Radiation* court concluded that "[t]he right to be free of state-sponsored invasion of a person's bodily integrity is protected by the Fourteenth Amendment guarantee of due process." *Id.* at 810–11. The Sixth Circuit compared *Cincinnati Radiation* to the Flint Water case before it, finding that "[i]n both instances, individuals engaged in voluntary actions that they believed would sustain life, and instead received substances detrimental to their health." 912 F.3d at 921. *Legionella* bacteria—or any similar life-threatening substance—resulting from Flint River water being channeled through a known, ill-equipped water treatment plant should be considered no different from lead.

The right to bodily integrity is not dependent upon which particular dangerous or even lethal substance came from Flint's pipes. Defendants made a choice to utilize the long dormant Flint Water Treatment Plant

("FWTP"), knowing that the plant required millions of dollars in upgrades before it could process the raw water from the Flint River, and that those upgrades would not be implemented. (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5214.) Defendants might not have known whether lead or *legionella* were going to result from this switch, but that does not change the involuntary and harmful nature of the intrusion Flint Water users experienced.

Because Plaintiff plausibly alleges that involuntary exposure to *legionella* stemming from the Flint Water Crisis implicates the right to bodily integrity, the Court now turns to each individual Defendant to determine whether they (1) knew of facts from which they could infer a substantial risk of serious harm, (2) did infer it, and (3) nonetheless acted with indifference, demonstrating a callous disregard towards the rights of those affected.

Plaintiff relies on the factual allegations from the *Walters* Master Complaint. But in *Walters*, the Court relied upon many facts that happened after Odie Brown's death that cannot be considered here. Therefore, the Court must determine whether there are enough facts

alleged against each Defendant before January of 2015 to show a callous disregard for Odie Brown's bodily integrity.

### i. State Defendants

For the reasons set forth below, Plaintiff states a bodily integrity claim against Governor Snyder but does not state a claim against former Treasurer Andy Dillon.

*Governor Snyder*

Plaintiff states a bodily integrity claim against Governor Snyder. Plaintiff alleges facts sufficient to meet the first and second element of a bodily integrity claim. Plaintiff plausibly alleges that Governor Snyder knew of and did infer a substantial risk of serious harm to Flint water users. He knew that the use of "Flint River water as a primary drinking source had been professionally evaluated and rejected as dangerous and unsafe" in 2011. (*Id.* at PageID.5077.) He also knew that under the plan to create the Karegnondi Water Authority, Flint River water would be used as an interim source of water for the City of Flint. (*Id.*) Plaintiff also alleges that shortly after the switch to Flint River water, the Governor's office began receiving complaints about the water. (*Id.* at PageID.5085.) There were also numerous press stories about water quality problems in

Flint as early as May 2014. (*Id.*) By June of 2014, "[m]any Flint water users reported that the water was making them ill" and in October 2014, "Flint's public health emergency was a topic of significant discussion in the Governor's office." (*Id.*) Similarly, in October of 2014, the Governor's office was on notice that General Motors stopped using Flint River water because it was corroding their machinery. (*Id.* at PageID.5086.) Shortly after GM stopped using the water, even a member of the Governor's staff, his Chief Legal Counsel, called the use of the Flint River as the drinking water source for the population of Flint "downright scary." (*Id.* at PageID.5087.) Accordingly, Plaintiff has plausibly alleged the first two elements of a bodily integrity claim.

As for the third element of a bodily integrity claim, in *Walters*, this Court relied on Governor Snyder's actions after January of 2015 to find deliberate indifference, but that analysis is inapplicable here. *See Walters*, 2019 WL 3530874, at *15–*16 (citing *Carthan*, 384 F. Supp. 3d at 841–42). The challenge here is deciding whether, when disregarding all of the Governor's actions after January 2015, Plaintiff can adequately allege deliberate indifference.

As for facts showing Governor Snyder's callous disregard, it may be enough that he authorized the switch to the Flint River,[12] knowing that "there was no agreed upon plan in place to implement the necessary remediation at the FWTP in order to use Flint River water as Flint's sole source of water." (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5077.) But certainly the Governor's continued inaction following the switch reinforces this deliberate indifference. The fact that the Governor authorized the switch to the Flint River knowing it was dangerous, and then did nothing for months despite ample notice of the harm Flint residents were experiencing states a claim of deliberate indifference.

*Andy Dillon*

Plaintiff does not successfully state a bodily integrity claim against Dillon. The Court has reconsidered the allegations against Dillon in *Carthan* and *Walters* and now decides that they are not adequate to state a bodily integrity claim against him. In *Walters*, the Court found that the

---

[12] Plaintiff also adequately alleges that Governor Snyder had authority over the decision to switch to Flint River water. (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5075–5078.)

Master Complaint—also used in this case—contained much the same allegations in *Carthan* where it found:

> [Dillon] allegedly knew that the Flint River had been rejected as a water source as recently as 2011, and that the FWTP would require substantial improvements to safely process the river's water. From this, it is reasonable to believe that Dillon was aware of the risks associated with using the Flint River as a water source. Yet despite this knowledge, Dillon helped to develop an interim plan that saw Flint transition to the Flint River. And importantly, he rejected a final bid from DWSD that could have obviated the need to use water from the Flint River until the FWTP had the capacity to treat it safely. This demonstrated an indifference to the risk of serious harm plaintiffs faced, made all the more inexplicable given that he knew DWSD presented the most cost effective mid-term option.

384 F. Supp. 3d at 858; 2019 WL 3530874, at *35.

But Plaintiff has not sufficiently alleged that Dillon had any authority over the switch to using Flint River water in April 2014. Records show that Dillon was not Treasurer of the State of Michigan at the relevant time of the switch to Flint River water,[13] and Plaintiff does

---

[13] Plaintiff does not mention in its complaint that Andy Dillon stepped down as Treasurer before the transition to Flint River water. In a motion to dismiss, however, the Court is allowed to consider matters of public record. *Bassett v. Nat'l Coll. Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). According to the State Treasury Annual Reports, Dillon is listed as the Treasurer for fiscal year 2011-2012, but not for fiscal year 2012-2013. *Compare Annual Report of the Michigan State Treasurer: Fiscal Year 2012-2013*, https://www.michigan.gov/documents/treasury/STAR_2012-2013_Final_453641_7.pdf *with Annual Report of the Michigan State Treasurer: Fiscal*

not allege that Dillon held any other governmental authority over the switch. Much like Emergency Manager Kurtz, Dillon was involved in developing the interim plan and both Kurtz and Dillon rejected the final bid from DWSD. (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5172.) But the Court found that "[a]lthough Kurtz may have set in motion the chain of events that led to the transition to the Flint River, he resigned as Flint's Emergency Manager before the transition and therefore lacked control over the final decision." *Carthan*, 384 F. Supp. 3d at 861. Similarly here, Dillon may have set in motion the chain of events that led to the transition to the Flint River, but he also lacked control over the final decision because he stepped down as Treasurer months before the transition. Plaintiff does not allege any facts to show that Dillon made the final decision in April 2014, nor does it explain how Dillon had any power over the transition to Flint River water after he was no longer Treasurer for the State of Michigan.

ii. **MDEQ Defendants**

---

*Year 2011-2012*, https://www.michigan.gov/documents/treasury/STAR2011-2012_430334_7.pdf. Dillon was not Treasurer of Michigan during the April 2014 switch to the Flint River.

Plaintiff successfully states a claim against MDEQ Defendants Busch, Prysby, and Shekter Smith, but not against Defendant Cook. In *Carthan*, the Court found that plaintiffs stated a claim against each of these MDEQ Defendants, but in this case the timing of Odie Brown's death impacts liability for Cook.

The Sixth Circuit found, analyzing a substantially similar complaint in *Guertin*, that the MDEQ Defendants were "front and center during the crisis" and "played a pivotal role in authorizing Flint to use its ill-prepared water treatment plant to distribute drinking water from a river they knew was rife with public-health-compromising complications." *Guertin v. State*, 912 F.3d 907, 927 (6th Cir. 2019). First the Court will set out the prior reasoning from *Carthan* and then analyze the claim against these particular Defendants.

As for elements one and two of a bodily integrity claim, the Court found as follows in *Carthan*:

> It is reasonable to assume that they were aware of the substantial risk of harm plaintiffs faced. Before Flint's transition to the Flint River, Shekter-Smith and Busch knew of the risks associated with the Flint River. In addition, Busch . . . and Prysby recognized that the FWTP was not ready to begin operations. After the transition, Rosenthal learned that the FWTP was not practicing corrosion control, and he and Shekter-Smith both knew that no legitimate lead and copper

27

testing was occurring. Moreover, Busch, Shekter-Smith, and Prysby also knew that the transition had created the conditions for *legionella* bacteria to flourish. Not to mention the fact that the EPA and civic leaders were raising concerns about the quality of Flint's water.

384 F. Supp. 3d at 859. The *Walters* Master Complaint contains similar allegations as *Carthan*, but given that Odie Brown's death was in January 2015, some of the alleged facts are not applicable to this case. Pertinently, Plaintiff did not allege that the MDEQ Defendants knew about the *legionella* issue until after Odie Brown died. (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5183.)[14] As explained above, however, the risks of using Flint River water channeled through the FWTP were substantial. The complaint alleges that many of these MDEQ Defendants knew as early as May 2014 that Flint's water was contaminated in ways that could be life threatening. (*Id.* at PageID.5130–5131, 5140–5141.) Even if the MDEQ Defendants were not aware of *legionella* bacteria in particular by the time of Odie Brown's death, the facts alleged plausibly

_____

[14] According to the Master Complaint, on March 10, 2015, James Henry of the Genesee County Health Department sent an email to state and city officials, noting that he had previously requested to meet with MDEQ regarding *legionella* concerns, but "MDEQ declined." (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5183–5184.) The complaint alleges that Henry sent FOIA requests to get information about issues with Flint's water in January 27, 2015, which appears to be when he requested cooperation from various actors including the MDEQ. (*Id.* at PageID.5092–5093.)

show that Busch, Shekter Smith, and Prysby were aware of the dangerous condition of the City's water supply before she died.

As to the MDEQ Defendants' deliberate indifference to these known risks, in *Carthan*, the Court found that:

> [D]espite knowing of these serious risks, these defendants were indifferent to them. Shekter-Smith ensured that Flint received the ACO that allowed it to transition to the Flint River; Cook signed the final permit necessary for the FWTP to begin operations; and Busch resolved the regulatory hurdles associated with Flint's use of the Flint River. Furthermore, these defendants took steps to deceive Flint's residents into continuing to drink and bathe in the contaminated water. Busch and Cook misled the EPA by falsely suggesting that the proper corrosion control was in use at the FWTP; and Busch, Rosenthal, and Prysby directly or indirectly altered reports to remove results showing high lead concentrations in Flint's water. These actions exhibited a callous disregard for plaintiffs' right to bodily integrity.

384 F. Supp. 3d at 859 (footnote omitted). The *Walters* Master Complaint tracks the allegations in *Carthan*, but some of the alleged facts are not applicable to this case in light of the fact that Odie Brown died in January 2015.

*Stephen Busch and Michael Prysby*

The Master Complaint plausibly alleges elements one and two of a bodily integrity claim: that Busch and Prysby were aware of and did infer that the FWTP was not ready to begin processing water and that as a

result, Flint water users faced a substantial risk of harm. (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5071–5072, 5079–5080, 5130–5131.) Plaintiff alleges that Busch was involved in resolving the regulatory hurdles to using Flint River water. (*Id.* at PageID.5173–5176.) For example, he helped obtain an Administrative Consent Order ("ACO") that was critical to allowing the City of Flint to begin using the FWTP, although the plant was "nowhere near ready to begin distributing water." (*Id.* at PageID.5176.) Plaintiff alleges that Prysby reviewed and approved the permit "that was the last approval necessary for the use of the Flint Water Treatment Plant." (*Id.* at PageID.5081, 5179.)

Moreover, shortly before the switch, the FWTP's water quality supervisor wrote to Prysby and Busch that he had inadequate staff and resources to properly monitor the water. (*Id.* at PageID.5080.) As a result, he informed Prysby and Busch, "I do not anticipate giving the OK to begin sending water out anytime soon. If water is distributed from this plant in the next couple of weeks, it will be against my direction." (*Id.*) But Prysby and Busch did not act on this warning. Later, on February 27, 2015, Busch misled the EPA, telling the agency that the City was using corrosion control, which he knew was false. (*Id.* at PageID.5092.)

These actions all show a callous disregard for Odie Brown's right to bodily integrity. Therefore element three is met. These Defendants knew there were significant and potentially life-threatening problems with Flint's water and they chose to do nothing. Accordingly, Plaintiff states a bodily integrity claim against Busch and Prysby.

*Shekter Smith*

Much the same as Busch and Prysby, the Master Complaint plausibly alleges elements one and two of a bodily integrity claim: Shekter Smith was aware of and did infer that the FWTP was not ready to begin processing water. (*Id.* at PageID.5071–5072.) She also knew of the substantial risks faced by exposure to Flint's municipal water. (*Id.*) Further, element three is met. The Master Complaint alleges that Shekter Smith "played an integral role in ensuring that the City of Flint" obtained the ACO that allowed Flint to transition to Flint River water. (*Id.* at PageID.5179.) These actions are enough to show callous disregard to Flint water users. As mentioned above, this ACO was critical to allowing the City of Flint to begin using the FWTP, which was "nowhere near ready to begin distributing water." (*Id.* at PageID.5176.)

Accordingly, Plaintiff states a bodily integrity claim against Shekter Smith.

*Patrick Cook*

The Master Complaint does not adequately allege that Cook knew about the substantial risk of harm to Plaintiff—a necessary element for a bodily integrity claim. The Master Complaint alleges that Cook "signed a permit in 2014 that was the last approval necessary for the use of the Flint Water Treatment Plant." (*Id.* at PageID.5081.) But it does not allege that Cook knew of the dangers to Flint water users before he signed this permit.

The Master Complaint also alleges that Cook misled the EPA regarding the necessity of using corrosion control in Flint after the switch by forwarding the EPA information he knew to be false. (*Id.* at PageID.5092.) However, the Complaint does not specify when Cook misled the EPA. Cook's earliest recorded communication with the EPA according to the Flint Water Advisory Task Force Report was sent in April of 2015.[15] (ECF No. 155-2, PageID.3411.) Because Odie Brown died

---

[15] This Report was referenced in the Master Complaint and attached to the State Defendants' motion to dismiss. (ECF No. 155-2, PageID.3411.) "When a court is presented with a 12(b)(6) motion, it may consider the Complaint and any exhibits

in January of 2015, Plaintiff has not stated a bodily integrity claim against Cook.

### iii. City Defendants

Plaintiff alleges that Defendants Earley, Ambrose, Croft, Johnson, and Glasgow violated Odie Brown's right to bodily integrity. For the following reasons, Plaintiff states a claim against Earley, Croft, Johnson, and Glasgow, but fails to state a claim against Ambrose.

*Darnell Earley*

Plaintiff states a bodily integrity claim against Earley. Earley was Flint's Emergency Manager during the transition to the Flint River as a water source. (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5055.) It is reasonable to infer, as Plaintiff alleges, that Earley was aware of the substantial risk of harm Flint water users like Odie Brown faced. Many people involved with the FWTP warned Earley that it was not ready for service. (*Id.* at PageID.5081, 5084–5085.) Despite these warnings, and under Earley's direction as Emergency Manager, Flint water users began

---

attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Coll. Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

receiving Flint River water from their taps. (*Id.* at PageID.5081) ("Earley ordered and set in motion the use of highly corrosive and toxic Flint River water knowing that the WTP was not ready.")

Plaintiff has plausibly alleged that Earley callously disregarded the risk of harm by ordering the transition to Flint River water in April of 2014. Earley might not have known that a *legionella* outbreak in particular would result, but he knew and disregarded a substantial risk of harm when he ordered the transition. Accordingly, Plaintiff states a claim against Earley.

*Gerald Ambrose.*

Plaintiff has not plausibly alleged that Ambrose showed a callous disregard for Plaintiff's bodily integrity. Ambrose was not appointed as Emergency Manager until January 13, 2015, (*Id.* at PageID.5056) which is after Odie Brown died from Legionnaires' disease on January 9, 2015. Plaintiff attempts to rely on the Court's reasoning in *Walters*. However, Ambrose's liability in *Walters* hinges on actions taken after he assumed the Emergency Manager position. *Walters*, 2019 WL 3530874, at *37. Plaintiff has not set forth any additional facts to show that Ambrose was

deliberately indifferent to Brown's bodily integrity. The claim against Ambrose is dismissed.

*Howard Croft, Daughtery Johnson, and Michael Glasgow*

Plaintiff pleads a plausible bodily integrity claim against Defendants Croft, Johnson, and Glasgow. As explained in *Carthan*:

> [I]t is reasonable to conclude that these defendants were aware of the substantial risk of harm facing plaintiffs. As the transition to the Flint River loomed, all three knew that the FWTP was not ready to process the raw water. And Croft, in particular, was aware of the lead and Legionnaires' disease issues that followed the transition. Glasgow tested for and found high concentrations of lead in the water. He also recognized that Flint was not using corrosion control treatment and had no legitimate lead and copper testing in place. Moreover, these defendants acted with a callous disregard for plaintiffs' right to bodily integrity. Despite knowing that the FWTP was not ready to process the Flint River water, Croft and Johnson pressured Glasgow to give the green light to the transition. Johnson later blocked the Genesee County Health Department from scrutinizing Flint's water testing process. And Glasgow altered reports to hide high lead concentrations in Flint's water. Croft, Glasgow, and Johnson were thus deliberately indifferent by deceiving plaintiffs into thinking that there was no problem with Flint's water.

384 F. Supp. 3d at 860. In *Walters*, the Court found that the Master Complaint contained essentially the same allegations as *Carthan*'s complaint with respect to the plaintiffs' bodily integrity claims against Croft, Johnson, and Glasgow. *Walters*, 2019 WL 3530874, at *18. The

Master Complaint was adopted in full here, but the Court must only consider factual allegations before Odie Brown's death in January of 2015.

There is no question that these Defendants were aware of the substantial risk of harm before January 2015. Moreover, all three Defendants participated in making the switch to the Flint River in April 2014, knowing that the FWTP was not ready to process water. This fact alone is enough to show callous disregard for bodily integrity. None of the additional deliberately indifferent actions cited by the Court in *Walters* will be considered here because they took place after Odie Brown died. But because these individuals were involved in the switch to the Flint River, knowing full well of the dangers, Plaintiff has stated a bodily integrity claim against Croft, Johnson, and Glasgow.

iv.  **City of Flint *Monell* Liability**

Plaintiff alleges that the City of Flint is liable under 42 U.S.C. § 1983 as a result of the unconstitutional actions taken by Earley and Ambrose. (*Walters*, No. 17-cv-10164, ECF No. 185-2, PageID.5051–5052, 5055–5056.) Under *Monell v. Department of Social Services of the City of New York*, a plaintiff can bring a § 1983 claim against a city for the

unconstitutional conduct of its employees if the employees' conduct implemented a policy "officially adopted and promulgated by that body's officers." 436 U.S. 658, 690 (1978). However, a municipality "cannot be held liable *solely* because it employs a tortfeasor." *Id.* at 691. Liability will only attach where the policy or custom was the "moving force" behind the constitutional violation. *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007).

In *Carthan*, the Court held that Earley and Ambrose "were final decisionmakers for Flint with respect to the decision to provide residents with contaminated water." 384 F. Supp. 3d at 865 (citing *Carthan*, 329 F. Supp. 3d at 421–22). As such, "their actions represented official policy and Flint could be held liable for their conduct insofar as it violated plaintiffs' rights." *Id.* (citing *Carthan*, 329 F. Supp. 3d at 422).

As set forth above, Plaintiff states a claim that Earley violated Odie Brown's constitutional right to bodily integrity, and therefore Plaintiff states a *Monell* claim against the City of Flint with respect to this right.[16]

---

[16] This is not because the City is liable for Earley's general conduct, s*ee Monell*, 436 U.S. at 691, but because his unconstitutional acts represented the implementation of City policy.

The City of Flint's motion to dismiss is therefore denied, and Plaintiff's *Monell* claim may go forward.

## C.  Gross Negligence against the Hurley Defendants

Plaintiff brings this gross negligence claim[17] against Hurley Medical Center and two of its employees, Newell and Birchmeier ("Hurley Defendants"). (ECF No. 73, PageID.355.)[18] Plaintiff claims that the Hurley Defendants failed to "inspect, test, correct, and treat its hospital water supply" which was "known to be contaminated with hazardous substances, including *legionella* bacteria." (*Id.* at PageID.356.) Plaintiff argues that these Defendants were grossly negligent and their conduct caused Plaintiff's decedent's injuries. (ECF No. 115, PageID.1894.) As such, Plaintiff contends that these Defendants cannot claim immunity under Michigan's Government Tort Liability Act

---

[17] As set forth in *Carthan*, "[g]ross negligence is not an independent cause of action in Michigan." 384 F. Supp. 3d 802, 871 (E.D. Mich. 2019) (citing *Xu v. Gay*, 257 Mich. App. 263, 268–69 (2003)). Although Plaintiff styles its proposed claim as one of gross negligence, the Court must treat it as one of ordinary negligence.

[18] Plaintiff originally also brought this gross negligence claim against the City of Flint (ECF No. 73, PageID.355), which moved to dismiss on the grounds of absolute immunity from tort liability. (ECF No. 84, PageID.967.) Plaintiff stipulated to the dismissal of this count against the City of Flint. (ECF No. 105, PageID.1774.)

("GTLA"), Mich. Comp. Laws. §§ 691.1401–19 (2014). (*Id.*) For the following reasons the Court grants the Hurley Defendants' motion to dismiss this claim.

The GTLA provides immunity for government defendants under various circumstances. Relevant here, "a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge or a governmental function." M.C.L. § 691.1407(1). Both parties agree that Hurley is a governmental agency owned and operated by the City of Flint. (ECF No. 90, PageID.1273); (ECF No. 115, PageID.1894.) *See also Holliday v. Hurley Medical Center*, 2006 WL 2742055 (Mich. App., No. 267614) (Sept. 26, 2006) (finding that Hurley Medical Center was a governmental agency owned by the City of Flint and thus protected by governmental immunity). Hurley Medical Center is therefore absolutely immune from tort liability in this case.

The GTLA also provides immunity for employees of government agencies while acting in the course of employment. M.C.L. § 691.1407(2). Defendants Newell and Birchmeier argue that they are entitled to qualified immunity from Plaintiff's claim under this provision. (ECF No. 90, PageID.1276.) As set forth in *Carthan* and again in *Walters*:

Lower-level employees are "immune from tort liability for an injury to a person or damage to property caused by the . . . employee . . . while in the course of employment" if the employee is "acting or reasonably believes he or she is acting within the scope of his or her authority," unless the employees' conduct amounts to "gross negligence that is the proximate cause of the injury or damage." § 691.1407(2)(a)–(c). To identify whether a lower-level employee was the proximate cause of an injury, courts must first evaluate "the conduct and any legal responsibility" of the various parties to an accident, *Ray v. Swager*, 501 Mich. 52, 74 (2017), where legal responsibility is assessed by determining whether the accident was a foreseeable consequence of an individual's actions, *see id.* at 69. And second, courts must jointly consider the actions of those legally responsible to determine whose conduct was the "one most immediate, efficient, and direct cause" of any injury. *Id.* at 83 (quoting *Robinson v. City of Detroit*, 462 Mich. 439, 462, (2000)). If the answer is anyone but the employee, the employee can claim immunity.

*Carthan*, 384 F. Supp. 3d at 853; *Walters*, 2019 WL 3530874 at *28.

Plaintiff in this case also does not adequately meet *Ray*'s causation requirement. 384 F. Supp. 3d at 853. Plaintiff's Addendum to its Short Form Complaint states that Defendants Newell and Birchmeier's conduct was the cause of Plaintiff's injuries, (ECF No. 73, PageID.356) but it fails to explain why such conduct was the "one most immediate, efficient, and direct cause" of those injuries. *Ray*, 501 Mich. at 83. Plaintiff attempts to distinguish this case from *Walters* where sixteen individual defendants were sued for gross negligence because this count

only alleges that two individual Defendants, Newell and Birchmeier, caused Plaintiff's injury. (ECF No. 115, PageID.1896.) However, Plaintiff checked the box for gross negligence on the Short Form Complaint, thereby incorporating the same sixteen-defendant gross negligence claim from *Walters* into its complaint. (ECF No. 73, PageID.334.) Indeed, Plaintiff's complaint brings gross negligence allegations against a combined nineteen Defendants for causing its decedent's death from Legionnaires' disease.

Even setting aside the incorporation of the gross negligence count from the Master Complaint, Plaintiff's own Addendum to its Short Form Complaint alleges that many other Defendants were responsible for the contaminated water that caused Plaintiff's death. (*Id.* at PageID.337) ("Defendant public officials and private engineering corporations, caused a catastrophic public health crisis beginning in April 2014.") This panoply of actors means that without specific showings by Plaintiff, the Court cannot find that Newell and Birchmeier's alleged failure to test and correct the contaminated water once it reached Hurley Medical Center was the "one most immediate, efficient, and direct cause" of their injuries. *Ray*, 501 Mich. at 83. "*Ray* clearly requires a plaintiff to identify which

defendant is most legally responsible for an injury." *Walters,* 2019 WL 3530874, at *29 ("Plaintiffs have mistakenly argued that *Ray* is satisfied if a plaintiff shows that a defendant is legally responsible in general.").

It is not enough that Plaintiff locate the individual Hurley Defendants along a chain of causation within the broader Flint Water Crisis. As set forth in *Carthan,* "[t]he sheer size and scale of the Flint Water Crisis makes it difficult for plaintiffs—or anyone—to identify any defendant most legally responsible for the resulting injuries." 384 F. Supp. at 854. As such, "the more governmental actors that are involved in causing a massive tort in Michigan, the less likely it is that state tort claims can proceed against the individual government actors[.]" *Guertin,* 2017 WL 2418007, at *27. This reasoning comes to a head in this case: without precise allegations relating to their responsibility relative to the many other actors Plaintiff accuses of wrongdoing, Defendants Birchmeier and Newell are entitled to immunity on this claim. Therefore Defendants' motion to dismiss this count is granted.

## D.  Damages

Plaintiff requests punitive damages against all Defendants, (ECF No. 73, PageID.335), (*Walters,* No. 17-cv-10164, ECF No. 185-2,

PageID.5234), and Defendants move to dismiss. (ECF No. 83, PageID.449); (ECF No. 86, PageID.1164); (ECF No. 90, PageID.1301); (ECF No. 91, PageID.1344–1345.)

In this opinion and order, the Court is dismissing all but two types of claims. First, Plaintiff successfully pleads a claim under 42 U.S.C. § 1983 that certain Government Defendants violated Odie Brown's right to bodily integrity; and second, Plaintiff states a claim that LAN was professionally negligent under state law. At oral argument, Plaintiff's counsel conceded that Plaintiff cannot request punitive damages with respect to the professional negligence claims. The Court therefore grants LAN's motion to dismiss this claim for punitive damages. But punitive damages may be awarded in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *King v. Zamiara*, 788 F.3d 207, 216 (6th Cir. 2015) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Plaintiff plausibly pleads recklessness and indifference to the right to bodily integrity. As a result, Plaintiff may continue to seek punitive damages with respect to its remaining § 1983 bodily integrity claims.

Plaintiff's request for exemplary damages against several Defendants is dismissed for the same reasons set forth in *Walters*. 2019 WL 3530874, at *42. Plaintiff also alleges that the named defendants are "jointly and severally" liable. (ECF No. 73, PageID.332.) However, Michigan has replaced joint and several liability with fair share liability. *See Smiley v. Corrigan*, 248 Mich. App. 51, 55 (2001). Plaintiff conceded this point at oral argument. As a result, any claim for joint and several liability is dismissed.

### E. All Other Counts

On the Short Form Complaint, Plaintiff checked the boxes for several other claims that this Court previously dismissed in *Walters*, 2019 WL 3530874. Plaintiff clarified in response briefs and at oral argument that its Short Form Complaint added no new claims or factual allegations against any other Defendants except McLaren and Hurley. (ECF No. 104, PageID.1761.) Plaintiff acknowledged that all other claims will be dismissed in keeping with this Court's decision in *Walters*, and Plaintiff only included these claims in order to preserve them for possible appeal. (*Id.*) On the basis of this Court's prior decisions in *Walters*, all

other claims, except for bodily integrity and professional negligence as discussed above, are dismissed.

## F.   Conclusion

Defendants' motions to dismiss Plaintiff's Short Form Complaint are granted in part and denied in part. More specifically, Defendants' motions to dismiss Count I (state-created danger) are granted; Count II (bodily integrity) are granted with respect to Dillon, Lyon, Wright, Walling, Ambrose, and Cook, but denied with respect to Snyder, Busch, Prysby, Shekter Smith, Earley, Croft, Johnson, Glasgow, and the City of Flint (*Monell*); Counts III and IV (equal protection) are granted; Count V (conspiracy) are granted; Count VI (ELCRA) are granted; Count VII (gross negligence) are granted; Count VIII (punitive damages) are granted with respect to Plaintiff's professional negligence claims, but denied with respect to Plaintiff's § 1983 claims; and Count XIV (gross negligence) are granted. In addition, Plaintiff's professional negligence count against LAN will go forward, but the request for exemplary damages is dismissed, along with any claim for joint and several liability.

## VI.   Order

IT IS ORDERED THAT,

Jeff Wright's motion to dismiss (ECF No. 79) is **GRANTED**; the State Defendants' motion to dismiss (ECF No. 83) is **GRANTED** in part and **DENIED** in part; the City Defendants' motion to dismiss (ECF No. 84) is **GRANTED** in part and **DENIED** in part; LAN's motions to dismiss (ECF Nos. 85, 86) are **GRANTED** in part and **DENIED** in part; the Hurley Defendants' motion to dismiss (ECF No. 90) is **GRANTED**; and the MDEQ Defendants' motion to dismiss (ECF No. 91) is **GRANTED** in part and **DENIED** in part.

As a result, Plaintiff's bodily integrity claims against Defendants Snyder, Busch, Prysby, Shekter Smith, Earley, Croft, Johnson, Glasgow, and the City of Flint (*Monell*) will proceed; its professional negligence claims against LAN will proceed; and Plaintiff may continue to request punitive damages with respect to its remaining § 1983 claim. However, in all other respects, Plaintiff's claims are dismissed.

IT IS SO ORDERED.

Dated: March 27, 2020        s/Judith E. Levy
Ann Arbor, Michigan        JUDITH E. LEVY
                                United States District Judge

# **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 27, 2020.

<u>s/William Barkholz</u>
WILLIAM BARKHOLZ
Case Manager